Tony CAMPOS and Alex
Lance, Plaintiffs,

v.

Thomas A. COUGHLIN, III, Commissioner New York State Department of Correctional Services ("DOCS"); Glenn Goord, Deputy Commissioner, DOCS; Earl B. Moore, Assistant Commissioner of Ministerial and Family Services, DOCS; John P. Keane, Superintendent, Sing Sing Correctional Facility; E. Reynolds, Superintendent, Oneida Correctional Facility; C. Greiner, Deputy Superintendent of Security Services, Sing Sing Correctional Facility; Thomas Eisenschmidt, Deputy Superintendent of Security Services, Oneida Correctional Facility; Sergeant Kennedy, Sing Sing Correctional Facility; Sergeant Salerno, Oneida Correctional Facility; Correctional Officer J. Knobloch, Oneida Correctional Facility; all individually and in their official capacities, Defendants.

No. 94 Civ. 1057 (SS).

United States District Court,
S.D. New York.

May 3, 1994.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Eric R. Dinallo and Brian G. Murphy of Counsel, for plaintiffs.

G. Oliver Koppell, Atty. Gen. of the State of N.Y., New York City, Barbara K. Hatha-

way, Asst. Atty. Gen., of counsel, for defendants.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiffs, two inmates in the New York State prison system, are followers and practitioners of the Santeria religion who are challenging a recently implemented directive of the Department of Correctional Services ("DOCS").[1] Plaintiffs seek injunctive and monetary relief for constitutional and statutory violations caused by the directive which prohibits prisoners from wearing certain religious artifacts, including plaintiffs' religious beads.[2] In the instant motion before me, plaintiffs seek an injunction requiring DOCS to return their confiscated beads and permission to wear them under their clothing during the pendency of this action.

This case raises significant constitutional and statutory issues about the protections accorded fundamental First Amendment rights of freedom of religious expression in a prison setting. It underscores the complex nature and difficulty of accommodating various religious belief systems and tenets within a prison system, wherein violence is a real and daily threat. Plaintiffs' herein challenge DOCS, and our society, to acknowledge their religious beliefs, no matter how unfamiliar they may be to prison officials, and to refrain from over-broadly burdening the practice of a non-mainstream religion. To that end, plaintiffs seek from this Court protection of their First Amendment rights.

For the reasons discussed below, I find that plaintiffs have shown irreparable harm as a result of DOCS' directive and both a likelihood of success on the merits, as well as significant questions going to the merits with the balance of the hardships in their favor. Plaintiffs' request for injunctive relief is, therefore, granted to the extent that DOCS may not prohibit plaintiffs from wearing their Santeria beads, under their clothing, or

1. Plaintiffs filed this action and requested injunctive relief *pro se*. By Order dated February 18, 1994, I referred the case to this Court's *pro bono* panel for appointment of counsel. The firm of Paul, Weiss, Rifkind, Wharton & Garrison immediately accepted this case and represented plaintiffs in the hearing for injunctive relief.

2. Although the DOCS directive did not address or prohibit religious shrines which inmates maintained in their cells, DOCS personnel interpreted the directive as authorizing them to confiscate such shrines when they contained beads or other items bearing colors. Transcript of March 31, 1994 Hearing, pp. 15–16 ("Tr."). These shrines, a devotional item for Santeria practitioners, traditionally contain religious beads, cigars and food, such as fruit for the Santeria saints. They may also contain crucifixes or other items commonly used by Catholics, for example pictures of saints and the Virgin Mary.

Initially, plaintiffs sought an order mandating the return of their shrines and granting them the right to maintain them in their cells. At the hearing on the instant motion, held before me on March 31, 1994, and in their post-hearing supplemental papers, defendants agreed to return the shrines to plaintiffs and to allow them to maintain their shrines, so long as the shrines are not constructed of contraband items, such as cement, and are not publicly displayed. The shrines, for example, may be kept in the inmate's locker or may be constructed facing a wall not visible to the public. *See* Tr. 34; Defendants

Supplemental Memorandum of Law in Opposition to Motion for a Preliminary Injunction, dated April 5, 1994, p. 4 ("Defendants' Supplemental Memorandum"). Defendants have also agreed that any future seizure of shrines would involve only confiscation of contraband items and not all devotional items placed in or around the shrines. Plaintiffs' counsel at the hearing conceded they were not challenging DOCS' right to prohibit inmates from constructing shrines containing contraband materials, except for beads, or to prohibit the public display of shrines. Tr. 16–17.

Subsequent to the hearing, defendants advised me that they could not locate, and have in all likelihood lost or misplaced, Campos' shrine and beads, and that the contraband items in Lance's shrine, consisting of bricks and a stone, were disposed of with Lance's prior knowledge and permission. Defendants' Supplemental Memorandum, pp. 3–4; Affidavit of Gale McGuane, Exhibit A ("McGuane Affidavit"); Affidavit of Joseph A. Demskie, ¶ 2 ("Demskie Affidavit"); Affidavit of Charles Greiner, ¶ 4. Lance denies he authorized the destruction of his shrine items. Nevertheless, because defendants have agreed to permit plaintiffs to maintain their shrines, the plaintiffs' request for injunctive relief on this issue has been rendered moot. Whether defendants may have improperly lost, misplaced or destroyed plaintiffs' shrines, is a damage issue to be assessed as part of the general prosecution of the instant action and does not impact on the preliminary relief requested herein.

placing beads on their non-publicly displayed shrines.

## I. *Background*

### A. *Facts*

Plaintiffs Tony Campos ("Campos") and Alex Lance ("Lance") are inmates, respectively, at the Sing Sing Correctional Facility ("Sing Sing") and the Oneida Correctional Facility ("Oneida") in New York State. Plaintiffs are also followers of Santeria, a religion practiced in Puerto Rico, Cuba and other parts of Latin America and the Caribbean, as well as parts of the United States, including New York. During the entire period that the plaintiffs have been incarcerated in the DOCS system—over 14 years in the case of plaintiff Campos—they have practiced their Santeria religion without any interference from DOCS personnel.

In 1993, DOCS revised its previous directives and regulations, restricting plaintiffs' religious practices by requiring that they prove to DOCS's satisfaction that they are genuine adherents of the Santeria religion and that the use of Santeria beads is a necessary tenet of Santeria religious practice. Even if plaintiffs convince DOCS that they are genuine Santeria practitioners and that their religion requires the use of beads, the directive at issue still limits plaintiffs' use to the mere possession of the beads. The wearing of Santeria beads is wholly prohibited under the directive. Plaintiffs charge that this limitation significantly burdens the free exercise of their religion and, therefore, cannot withstand legal scrutiny.

The relevant facts are not disputed. The impact and significance of defendants' actions, however, are the subject of much discord among the parties. Prior to the challenged revision of its regulations in 1993, DOCS permitted prisoners to possess and wear religious beads. Inmates were permitted to receive religious beads from outside the prison after local prison facility personnel determined that an inmate was a genuine adherent of a religion requiring the use of beads. Transcript of March 31, 1994 Hearing, p. 45 ("Tr."). On November 30, 1993, DOCS issued revisions to its Directive # 4202. This directive addresses religious practices throughout the DOCS system and sets forth the permissible use of religious artifacts, including, but not limited to, beads and medals. The directive became effective on January 1, 1994, but permitted inmates until March 1, 1994, to comply with the new directive's mandate by discarding or sending home the newly-proscribed items. The DOCS directive further provided a mechanism whereby inmates, like plaintiffs, could seek permission prior to and after the effective date of the directive, to possess, although not wear, the proscribed religious items.

DOCS's revisions were based on its conclusions that there was system-wide use by prison gangs of beads as gang membership identification symbols. According to defendants, some prisoners were restringing religious beads, to project identifiable membership in particular gangs by the color of the beads. DOCS concluded that the beads facilitated gang violence, rivalry and confrontation because inmates could identify rival gang members by the colors of the wearer's beads. Defendants claim that gang activity causes "friction, rivalries and even violence among inmates, thereby threatening the safety and security of the facility." Defendants' Memorandum of Law in Opposition to Motion for a Preliminary Injunction, pp. 8–9; *see also* Defendants' Supplemental Memorandum, Dated April 5, 1994, pp. 4–5 ("Defendants' Supplemental Memorandum"). The directive prohibiting the wearing of beads, thus, is defendants' attempt to diminish gang violence and further "DOCS's interest in stemming the activity of gangs and other unauthorized groups." Defendants' Supplemental Memorandum, p. 4.

Directive # 4202 establishes a hierarchy of religious artifacts, with those items recognized by DOCS personnel as "traditional," such as crucifixes and crosses, receiving preferred treatment in that inmates may receive, possess and wear them, under their clothing, without DOCS's prior approval. The second tier of the hierarchy provides that inmates may receive and possess, but not wear, black rosary and Dhikr beads, again without prior approval. At neither tier does DOCS require inmates, except for

Santeria adherents, to provide a religious-based justification for such possession. Plaintiffs' Santeria beads, thus, are left in a black hole of items which must be approved prior to the inmates' receiving or possessing them. Unlike the other items referred to in the directive, which are presumed to be genuine religious articles to be used for religious purposes, Santeria beads are denied such a presumption of authenticity. As it currently reads, Directive #4202 reflects DOCS's judgment and choice, based on religious practices familiar to defendants, as to which religious items and practices are *prima facie* acceptable and those which are not.

Revised Directive #4202 provides, in relevant part, that:

Inmates will be permitted to wear only traditionally accepted religious medals, crucifixes, or crosses. The religious medal, crucifix, or cross shall be affixed to a chain only. It is not acceptable to wear religious medals, crucifixes or crosses that are affixed to beads, leather, strings, or rope.

\* \* \* \* \* \*

All approved religious medals, crucifixes, and crosses shall not be visible and shall be worn underneath clothing at all times.

Rosary beads and Dhikr beads are not considered religious medals, and, as such, may be possessed for prayer and worship, but not worn or displayed. Rosary and/or Dhikr beads in the color of black only will be permitted.

Other traditionally accepted prayer beads, documented and supported on a theological basis for use in the practice of an inmate's documented religion, may also be possessed, but not worn or displayed. Only those colors documented and supported on a theological basis in the practice of an inmate's documented religions will be considered for approval, pursuant to review by the Senior Chaplain and Deputy Superintendent for Security Services. After the review by the Senior Chaplain and Deputy Superintendent for Security Services, a decision will be made to either disapprove

the beads or recommend approval to Central Office. If recommended for approval at the facility level, a photograph and a written explanation regarding the theological basis for the recommended approval shall be forwarded to the Assistant Commissioner for Ministerial Services who will review the facility recommendation with the Deputy Commissioner for Correctional Facilities, at which time approval or disapproval shall be determined. If approved by Central Office, the beads will be registered at the facility and a permit will be issued.

Amended Complaint, Exhibit B.[3]

Thus, "traditionally accepted religious medals, crucifixes, or crosses" and rosary beads and Dhikr beads can be received by inmates without certification of the inmate's religious beliefs. In contrast, the administrative mechanism established by Directive #4202 for the approval of Santeria beads consists of a two-step process, wherein the inmate first must seek certification of his or her religious adherence and approval of the possession of the beads from the facility's personnel, and then from the DOCS Central Office.

At the facility level, the chaplain interviews the inmate and may ask questions "to satisfy himself that the inmate is familiar with the religion." Defendants' Supplemental Memorandum, p. 2. Then, the Deputy Superintendent for Security Services reviews the beads in order to assess whether they "constitute a threat to the security of the facility." *Id.* Thereafter, if the chaplain and the Deputy Superintendent agree, they send a recommendation for approval with a photograph of the beads to the DOCS Central Office. At this second stage, the Deputy Commissioner for Correctional Facilities and the Assistant Commissioner for Ministerial Services consider approval of the beads. Defendants assert that this Central Office review is necessary "in order to ensure uniform treatment of all inmates, and to bring a state-wide perspective to the review." *Id.* Although defendants have estimated that this process generally should take no more than four

**3.** A complete version of the revisions to Directive #4202 and a related directive, #4911, are attached as an Appendix to this Order and Opinion.

weeks—two at the facility level and two at the Central Office level—well over two weeks have elapsed since DOCS Central Office undertook plaintiffs' certifications and DOCS still has not concluded the process. *See id.* at 3.

Plaintiff Lance alleges that on or about November 10, 1993, approximately six weeks before the January 4, 1994 effective date of Directive # 4202, Sing Sing personnel confiscated his beads. Lance further claims that his beads were again confiscated upon his subsequent transfer to Oneida two weeks later, on November 24, 1993.[4] Lance was also issued an Inmate Misbehavior Report for possession of the contraband religious items. The charges were upheld after a hearing on December 3, 1993. Lance filed a grievance based on the confiscation and sent various letters to DOCS personnel, including Oneida's Superintendent, defendant Reynolds, concerning his beads.

Similarly, on or about January 5, 1994, Sing Sing personnel confiscated plaintiff Campos' beads under Directive # 4202. On January 6, 1994, Campos filed a grievance with the Inmate Grievance Resolution Committee ("Committee"), challenging Directive # 4202 because it infringed on his freedom of religious expression. On January 18, 1994, the Committee rejected Campos' grievance and, shortly thereafter, on January 31, 1994, Sing Sing's Superintendent, defendant Keane, denied Campos' appeal.

It does not appear that either plaintiff completed the DOCS approval procedure set forth in Directive # 4202 prior to initiating the instant action and seeking preliminary relief for permission to wear their beads under their clothing.[5] At the conclusion of a hearing before me on March 31, 1994 ("the Hearing"), however, defendants commenced the approval process for determining whether to permit Campos and Lance to possess, but not wear, their beads. Shortly after the Hearing, defendants informed me that DOCS

facility personnel have recognized both plaintiffs as adherents of Santeria and would recommend that their beads be approved by the Central Office. *See* Defendants' Supplemental Memorandum, p. 3. The Central Office, as of this date, has yet to render a decision on the plaintiffs' requests.

## B. *Plaintiffs' Religious Practices*

### 1. *The Sincerity of Plaintiffs' Beliefs*

Plaintiffs claim that they have practiced Santeria since they were children and that they are bona fide adherents of the Santeria religion. Affidavit of Tony Campos, ¶ 2 ("Campos Affidavit"); Affidavit of Alex Lance, ¶ 2 ("Lance Affidavit"). Plaintiffs also aver that they seek to wear their Santeria beads strictly for devotional purposes, in accordance with their religious beliefs. In their affidavits, Campos and Lance affirm that, like other Santeria adherents, they believe they "must wear sacred [Santeria] beads of certain color combinations at all times except when engaging in sexual intercourse, bathing, or sleeping," because the beads, "when worn, protect [them] from danger and from evil to which [they] might otherwise be vulnerable," and that the beads "when worn, will bring [them] good fortune, peace, purity and good health." Campos Affidavit ¶¶ 3–4; Lance Affidavit ¶¶ 3–4. Both plaintiffs further claim that they will suffer serious negative consequences if they do not wear their beads and each has affirmed that in accordance with Santeria religious tenets they are "subject to danger and evil" without the protection of their beads. Campos Affidavit ¶ 12; Lance Affidavit ¶ 18.

Defendants do not concede the genuine or sincere nature of plaintiffs' religious beliefs and have alleged that they could not "verify that plaintiffs desire these beads for the practice of their religion." Affidavit of Glenn S. Goord, ¶ 4, Exhibit A. To support their position that there is a genuine question

---

**4.** Defendants, however, have denied ever having Lance's beads in their possession. Defendants' Supplemental Memorandum, p. 4.

**5.** At a hearing before me, on February 25, 1994, defendants agreed to refrain from disposing of the plaintiffs' beads on the scheduled March 1,

1994 cut-off date set forth in Directive # 4202. It was this Court's understanding that this agreement maintained the *status quo.* However, defendants subsequently informed the Court that the confiscated beads and shrines had been disposed of or lost notwithstanding this agreement.

about the plaintiffs' religious beliefs, defendants have submitted documents which indicate that upon their entry into the prison system, plaintiffs Campos and Lance identified themselves as, respectively, "Catholic" and "Christian."

Defendants' attempt to cast doubt upon plaintiffs' religious beliefs is not persuasive. There is nothing in the record to suggest that plaintiffs, although devout Santeria practitioners, do not also acknowledge certain aspects of Catholicism and Christianity, as do other practitioners of Santeria. Indeed, only last year, prior to the DOCS directive's effective date, the Supreme Court recognized that "Catholic symbols are often present at Santeria rites, and Santeria devotees attend the Catholic sacraments." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* —— U.S. ——, ——, 113 S.Ct. 2217, 2222, 124 L.Ed.2d 472 (1993). At the Hearing, plaintiffs' counsel also noted that defendants' own expert, Raul Canizares, has written a book in which he indicates that Santeria adherents usually identify themselves as Catholics when asked their religious affiliation. Tr. 64. I further assume that defendants had access to their own prison personnel and records and that, if there was any evidence of gang affiliation or other factors to suggest that plaintiffs' alleged religious beliefs are insincere, defendants would have presented such evidence to the Court.

Finally, defendants have recently informed me that, at least at the individual facility level, plaintiffs are now accepted as adherents of the Santeria religion. *See* Defendants' Supplemental Memorandum, p. 3. Based on this information, and solely for purposes of the preliminary injunction motion, I accept that plaintiffs' asserted religious beliefs are sincere and that their challenge to the DOCS's directive is based on their desire to practice their religion free from undue constraints.

### 2. *Santeria Practices and the Wearing of Beads*

Santeria is a religious belief system with a long and rich history in the Caribbean and Latin America. It is an expression of what experts term a "syncretion," or fusion, of African religion and Roman Catholicism.

Saints are fundamental figures in Santeria. They play the role of guide and patron to Santeria devotees. The saints in the Santeria religion, however, are different in character and status from the saints recognized and venerated in Catholicism. The Saints, or Orishas as they are known in Santeria, have distinct personalities and temperaments and Santeria practitioners have specific patron Orishas with whom they have a spiritually intimate affiliation. The saints and spirits, and the adherent's devotion to the Orishas, are central aspects of Santeria beliefs. *See Church of the Lukumi Babalu Aye,* —— U.S. at ——, 113 S.Ct. at 2222.

Devotion to the Orishas and commitment to Santeria is expressed, in part, by the follower's wearing of a necklace of colored beads, the practice at issue in this action. The beads are not mere symbols of some greater entity or a tool for veneration. According to plaintiffs' expert, the beads are "a focus of spiritual presence, as protection against misfortune, and as markers of spiritual identity." Affidavit of Joseph M. Murphy, ¶ 9 ("Murphy Affidavit"). Significantly, Santeria adherents believe that if the practitioner wears these beads faithfully the beads ensure the practitioner's closeness to the Orishas, as well as protection from negative forces and events. Even a simple transgression from this practice, such as a temporary removal of the beads for some reason other than those recognized by adherents, or the blemishing of the beads as a result of their handling by someone other than the wearer, may lead to negative consequences for the practitioner.

The colors of the beads, and color combinations of bead strands, also carry great significance in the Santeria religion because different color beads correspond to particular Orishas and particular days of the week. When a practitioner recognizes a patron Orisha, that individual then wears that patron's colors on a bead necklace. In addition, the follower also wears the beads which correspond to the Orisha recognized on that particular day of the week. Consequently, a practitioner of Santeria may wear several strands of beads, in various colors, some worn daily and others worn on different days of the week.

Both Campos and Lance wish to wear, in direct contravention of Directive # 4202, the beads which represent their patron Orisha, along with the bead necklace corresponding to a particular day's Orisha. Campos claims that he must wear black and white beads, the colors of his Orisha, Oya, all the time, and the beads corresponding to the Orisha for that weekday. So that on Monday, for example, he wears black and white beads, as well as the beads for the Orisha Eleggua, whose colors are red and black, and who is recognized on Monday. Plaintiff Lance claims that he must wear the white and red color beads for his Orisha, Chango, every day, in addition to his daily Orisha beads. *See* Plaintiffs' Memorandum of Law in Support of Preliminary Injunction, p. 9.

### C. *Plaintiffs' Claims*

Plaintiffs challenge the DOCS directive, on its face and as applied, as a statutory and unconstitutional infringement on their free exercise of religion because the directive prohibits plaintiffs from wearing then Orisha beads. Specifically, plaintiffs allege that the directive violates the recently-enacted Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb (Supp.1994), their right to freedom of expression protected under the First and Fourteenth Amendments and their Fourteenth Amendment equal protection and due process rights.

Plaintiffs also charge that the two-step approval process established by defendants for purposes of granting permission to an inmate to possess beads is unduly burdensome, unnecessarily lengthy and cumbersome. Plaintiffs' more compelling challenge, however, alleges that the process is fundamentally ineffective because it fails to provide plaintiffs with a real remedy: approval to wear beads. Plaintiffs claim that so long as defendants refuse to modify the directive to permit the wearing of beads, the approval mechanism does not address their religious needs.

Defendants claim that the directive is a proper means to address prison gang violence and does not violate plaintiffs' constitutional rights because it does not impose a significant burden on plaintiffs' free exercise of religion. Defendants argue that once plaintiffs establish, through the approval process, the sincerity of their religious beliefs and the genuine nature of their request to use beads solely for religious purposes, that plaintiffs will be allowed to possess the beads. Since, according to the defendants, Santeria tenets are satisfied by the mere possession, without wearing, of beads, plaintiffs are not significantly burdened by the DOCS's possession restriction. Defendants refused plaintiffs' compromise proposal, maintaining that wearing beads under clothing would still undermine penological security objectives. Defendants argue that the Court should defer to DOCS's judgment of the proper balance between DOCS's institutional needs and plaintiffs' individual rights.

I do not approach this matter with a blank slate. Neither I, nor defendants, are without benefit of some discussion of Santeria and the recognition of its protected status within constitutional moorings. Last year, the practices of Santeria were considered and accorded First Amendment protection, by the Supreme Court in *Church of the Lukumi Babalu Aye*. In addition, as the parties and their experts recognize, Santeria has been the subject of much literature and academic discourse. *See e.g.*, Migene Gonzalez–Wippler, *Power of the Orishas: Santeria and the Worship of Saints* 5 (1992); M. Gonzalez–Wippler, *Santeria: African Magic in Latin America* (2d ed. 1992); Raul Canizares, *Walking with the Night: The Afro–Cuban World of Santeria* (Rochester, Vt.: Destiny Books 1992); 13 The Encyclopedia of Religion 66 (M. Eliade ed. 1987); 1 Encyclopedia of the American Religious Experience 183 (C. Lippy & P. Williams eds. 1988).

The Supreme Court in *Church of the Lukumi* admonished legislators that in their zeal to regulate conduct they must be ever mindful of the First Amendment's requirements:

The Free Exercise Clause commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures. Those in office must be resolute in resisting importunate demands and must ensure that the sole reasons for imposing the burdens of law and

regulation are secular. Legislators may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices.

— U.S. at ——, 113 S.Ct. at 2234.

 With these principles and the Supreme Court's warning in mind, I now consider the instant motion.[6]

6. Before considering the substantive issues raised by the instant motion, I address defendants' argument that I abstain from further action in this case, in accordance with *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), because plaintiff Campos has filed an administrative appeal of his grievance and because DOCS's administrative approvals of plaintiffs' possession of beads are pending. I disagree with defendants and conclude that *Younger* abstention is not mandated in this case.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). Under the *Younger* doctrine, in order for this Court to deviate from the general mandate favoring the exercise of jurisdiction, there must be an ongoing state proceeding, in which an important interest is implicated, and the plaintiff has adequate opportunity for judicial review of his or her constitutional claims during or after the proceeding. *Cullen v. Fliegner*, 18 F.3d 96, 103–04 (2d Cir.1994) (citing *Christ the King Regional High School v. Culvert*, 815 F.2d 219, 224 (2d Cir.), *cert. denied*, 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 63 (1987). As this Circuit has recognized, *Younger* abstention is appropriate where

ordinarily a state proceeding provides an adequate forum for the vindication of federal constitutional rights, *Kugler v. Helfant*, 421 U.S. 117, 124[, 95 S.Ct. 1524, 1530–31, 44 L.Ed.2d 15] (1975), and so due deference ought to be paid the principles of comity and federalism. *Younger*, 401 U.S. at 44 [91 S.Ct. at 750–51]. *Younger* abstention applies to state judicial and administrative proceedings, so long as the state court has a means of reviewing constitutional claims.

*Id.*, 18 F.3d at 103–04.

I cannot find, on this record, grounds to abstain in this case. First, at the time that the instant action was filed, there were no pending state court proceedings relating to Lance's claims. Supplemental Affidavit of Alex Lance, ¶¶ 7–8. Thus, there was no pending state court proceeding within the meaning of *Younger* which would warrant abstention and no requirement in law or otherwise that plaintiffs exhaust state remedies before seeking vindication of their constitutional or statutory First Amendment rights in federal court.

Second, DOCS admits that Campos cannot secure through the administrative process the very relief he seeks—the wearing of his beads—be-

## II. *The Motion for Preliminary Injunction*

A preliminary injunction may issue only where the movant has shown "(1) irreparable harm and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair ground for litigation, and a balance of hard-

cause DOCS will only permit him to possess beads. I also have serious doubts whether he can secure state judicial review of his challenge considering the current posture of Campos' grievance as presented to this Court by the defendants. As the Second Circuit has indicated, an Article 78 proceeding—the available means for Campos to challenge DOCS's administrative decision—is not the appropriate forum for a facial challenge to the regulations. *Cecos Int'l, Inc. v. Jorling*, 895 F.2d 66, 71 (2d Cir.1990) (citing *Board of Educ. v. Gootnick*, 49 N.Y.2d 683, 687, 404 N.E.2d 1318, 427 N.Y.S.2d 777 (1980)); *see also* N.Y.CIV.PRAC.L. & R. § 7803 (McKinney 1981). While the New York courts may treat the Article 78 as a declaratory judgment action if all the necessary parties are before the court, *Cecos*, 895 F.2d at 71, defendants concede that only plaintiff Campos' state process is pending. Hence, abstention is not required. *See Mount Sinai Union Free School Dist. v. Board of Educ. Port Jefferson Public Schools*, 836 F.Supp. 95, 100 (E.D.N.Y.1993) (*Younger* abstention does not apply where certain plaintiffs and defendants who are parties to the federal action were not joined in the Article 78 proceeding).

Finally, defendants also charge that plaintiffs should be denied a preliminary injunction because they waited an undue amount of time between the announcement of the new directive in November 1993 and the initiation of the present action in February 1994. Defendants' arguments are wholly without merit since neither plaintiff acted in a dilatory manner warranting the application of principles of estoppel to their injunctive relief claims. Both plaintiffs spent extensive periods of time grieving the application of the directive through DOCS' administrative channels. Defendants themselves delayed the administrative process by taking one month to decide the grievances. Moreover, according to the documents submitted to this Court, Sing Sing Superintendent defendant Keane denied Campos' grievance on January 31, 1994, and the Central Office Review Committee denied Lance's grievance on February 16, 1994. Amended Complaint ¶ 56; Supplemental Affidavit of Alex Lance, ¶ 7. Plaintiffs' filing of this action *pro se* on February 17, 1994, very shortly after their grievances were denied by DOCS and several weeks before the directives' revisions were to go into effect, can hardly be considered dilatory. Consequently, defendants' claim that plaintiffs "unreasonably delayed in bringing" this action is unsupported by the record.

ships tipping decidedly toward the party requesting the preliminary relief." *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir.1994) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)).

■ Ordinarily, violations of First Amendment rights are recognized as constituting an irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); *Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir.1991). Plaintiffs have succinctly set forth sufficient allegations of a violation of their First Amendment rights to the free exercise of their religion to satisfy this first requirement for a preliminary injunction.

Moreover, the balance of hardships tilts decidedly in the plaintiffs' favor. Plaintiffs claim that they have no other way of practicing their religious beliefs other than by the very act which defendants forbid: the wearing of their beads. In contrast, and as is more fully discussed below, defendants have an alternative means to further their goal of institutional security and control, which would not significantly burden plaintiffs'

right to religious expression. They can simply permit plaintiffs to wear their beads under their clothing.

The central question remaining, then, is whether plaintiffs have shown a likelihood of success on the merits or a sufficiently serious question going to the merits justifying the issuance of injunctive relief. For the reasons discussed below, I conclude that the plaintiffs have carried their burden on this second requirement for preliminary injunctive relief.

### III. *The Religious Freedom Restoration Act*

■ Plaintiffs challenge the DOCS directive under the Religious Freedom Restoration Act of 1993 ("the Act").[7] The Act is of historical and legal significance because it reinstates the "compelling state interest" standard applicable to free exercise of religion claims previously eviscerated by the Supreme Court's decision in *Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).[8] The Act is also notable

---

**7.** Defendants challenge the constitutionality of the Act, alleging that it is beyond the authority of Congress to change the standard of review applicable to a free exercise of religion claim, a task they maintain is solely within the purview of the judicial branch. However, because I conclude that the directive does not satisfy even the less onerous reasonableness standard in existence prior to the passage of the Act and, because for purposes of this motion for preliminary relief, I need only determine the likelihood of success on the merits of the claims, I need not address the constitutional challenge at this juncture. When the constitutional question is squarely before me, 28 U.S.C. § 2403 (1978) requires that the Attorney General of New York have the opportunity to address the statute's constitutionality before I decide the issue.

As an aside, my cursory review of defendants' argument raises significant questions as to the viability of defendants' challenge. Defendants have not cited any authority to support their argument that Congress may not provide greater protection to the rights recognized in the Constitution. While Congress may not diminish constitutionally protected rights by allowing for less protection than the Constitution mandates, it is not restricted to provide only the constitutional minimum. *See Katzenbach v. Morgan*, 384 U.S. 641, 651 n. 10, 86 S.Ct. 1717, 1724 n. 10, 16 L.Ed.2d 828 (1966) (Congress has power to adopt measures to enforce the Fourteenth

Amendment but it cannot "restrict, abrogate, or dilute" the amendment's guarantees).

**8.** In *Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court rejected what had been known as the "compelling state interest" test in the First Amendment context. Under that test, legislation which burdened the free exercise of religion could survive judicial scrutiny and a constitutional challenge only if the legislation furthered a compelling state interest and was narrowly tailored to achieve that goal. *See Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In the *Smith* case, the Court rejected the universal application of the compelling interest test to facially neutral and generally applicable laws and, instead, pronounced a less stringent standard applicable to free exercise cases:

> We conclude today that the sounder approach, and the approach in accord with the vast majority of our precedents, is to hold the ["compelling government interest"] test inapplicable to [free exercise] challenges.

*Smith*, 494 U.S. at 885, 110 S.Ct. at 1603.

> The Court's test as determined in *Smith* is that, a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. *Employment Div., Dept. of Human*

for its application of the compelling governmental interest test to inmates' cases which, prior to the passage of the Act, were subject to a less onerous standard of review, favoring prison administrators so long as the prison regulation was reasonably related to a legitimate penological interest. *See Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) (prison regulation must be "reasonably related to legitimate penological interests."); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987) (prison regulations must satisfy the less restrictive reasonableness test).

Two other federal courts which have addressed the issue of whether the Act applies to inmates' free exercise of religion claims have concluded that the Act controls the standard to be applied to those cases. *See Allah v. Menei,* 844 F.Supp. 1056, 1060–62, & n. 18 (E.D.Pa.1994); *Lawson v. Dugger,* 844 F.Supp. 1538, 1541–42 (S.D.Fla.1994).[9] I agree with these courts. The plain language of the statute makes it clear that it applies to all state laws and regulations without exception. The Act, in relevant part, states:

### SEC. 3 FREE EXERCISE OF RELIGION PROTECTED

(a) IN GENERAL.—Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b) EXCEPTION.—Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

(c) JUDICIAL RELIEF.—A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

42 U.S.C. § 2000bb–1 (Supp.1994).

The Act defines "government" to include ... a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, a State, or a subdivision of a State

*Id.* § 2000bb–2.

The Act applies "to all Federal and State law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after" the enactment of the

---

*Resources of Oregon v. Smith, supra.* ... A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.
*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* —— U.S. ——, ——, 113 S.Ct. 2217, 2225, 124 L.Ed.2d 472 (1993).

The directive at issue here is neither neutral or generally applicable, but rather a direct unequivocal restriction on religious practices. However, even before passage of the Act, the Supreme Court's *Smith* decision would not have dictated the standard applicable to the regulation. Instead, the *O'Lone/Turner* standard, discussed above in greater detail, would have governed.

**9.** In *Allah v. Menei,* 844 F.Supp. 1056 (E.D.Pa. 1994), the District Court concluded that the Religious Freedom Restoration Act and the compelling interest/least restrictive means test set forth therein applied to an inmate's free exercise of religion claim. The plaintiff inmate in *Allah,*

representing an inmate Muslim group, sought recognition of the group and the same opportunity to practice religion as other prison religious groups, in particular the prison's Nation of Islam chapter. The Court concluded that defendants' unsupported allegations and assertions about the penological interests involved failed to demonstrate how the regulation at issue complied with the Act.

In *Lawson v. Dugger,* 844 F.Supp. 1538 (S.D.Fla.1994), the District Court also concluded that the Act and its standard applied to plaintiff inmates' First Amendment claims. The Court in *Lawson* determined that the challenged state regulation denying plaintiffs, adherents of the Hebrew Israelite religion, access to their religious literature and the opportunity to practice their religion on an equal basis as other religious groups, violated the Act. The Court concluded that the state ban on Hebrew Israelite literature was not the least restrictive means of furthering the government's compelling interest in maintaining internal order and security.

Act. *Id.* § 2000bb–3. In sum, the Act, on its face, plainly applies to inmates' claims challenging prison rules which substantially burden their free exercise of religion, and requires that any such rule be in furtherance of a compelling interest and be the least restrictive means to secure the government's objectives.

The legislative history of the Act also confirms that both the Senate and the House considered and rejected an exception to the Act for inmates' claims. The Senate Committee determined that the Act properly balanced inmates' rights with compelling governmental interests in the prison context:

> ... the committee concludes the first amendment doctrine is sufficiently sensitive to the demands of prison management that a special exemption for prison free exercise claims under the act is unnecessary.

S.Rep. No. 103–111, 103rd Cong., 1st Sess. (1993) ("Senate Report").[10] Similarly, after considering the government's interests in "[e]nsuring safety and orderliness of penological institutions" and accepting that these interests are of the "highest order," the House Committee, nevertheless, accepted the Act's applicability to inmates' claims. *See* H.R.Rep. No. 103–88, 103rd Cong., 1st Sess. (1993) ("House Report"). Thus, the Act prohibits government from substantially burdening any individual's exercise of religion, except if the government can establish a compelling interest and that the measure adopted is the least restrictive means to further its objectives.

The Supreme Court's pre-Act decisions in *O'Lone* and *Turner* are of contextual importance to an understanding of the different standard of review which I am compelled to apply in this case. In *O'Lone*, the Supreme Court concluded that the appropriate gauge of the constitutionality of prison rules as a burden on an inmate's religious freedom is whether the regulation is "reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. at 349, 107 S.Ct. at 2404. The Court in *O'Lone* upheld the refusal to provide inmates with religious services on Friday afternoon, concluding that such refusal was reasonable in light of the penological concerns for security and rehabilitation. The Court isolated inmates' claims from other constitutional claims, setting a lesser standard to the former, and describing the reasonableness standard as "less restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* In *Turner*, the Court set forth the factors for courts to generally consider in assessing the reasonableness of a prison regulation. *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 1262. Those factors reflect the presumed great deference due penological needs within the unique prison environment.

Congress, by passing the Act, rejected the less rigorous standard adopted by the Supreme Court in *O'Lone* and *Turner*, and reinstated the compelling interest test previously recognized by the Supreme Court in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and again in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).[11] The Act states unequivocally that one of its purposes is,

> to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398[, 83 S.Ct. 1790, 10 L.Ed.2d 965] (1963) and Wisconsin v. Yoder, 406 U.S. 205[, 92 S.Ct. 1526, 32 L.Ed.2d 15] (1972) and to guarantee its application in all cases where

---

10. The Senate Committee recognized the sufficiency of the courts' existing jurisprudence on claims based on religious freedom which are made in bad faith and for illegitimate purposes:

 Existing analytical tools are also adequate to uncover false religious claims that are actually attempts to gain special privileges or to disrupt prison life. [] ... The [A]ct has no effect on this settled jurisprudence, thus permitting the courts to make these assessments as they have in the past.

 Senate Report at 11.

11. The Court in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), held that a statute precluding a Seventh Day Adventist from receiving unemployment benefits because she would not work on her Sabbath violated her free exercise of religion. In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Court held that a state's mandatory education requirement as applied to Amish children violated their free exercise of religion. The Court struck down both statutes under the compelling interest test.

free exercise of religion is substantially burdened....

42 U.S.C. § 2000bb.

Despite the defendants' claims to the contrary, based on the record before me, plaintiffs have shown a likelihood of success on their challenge that the burden on plaintiffs' exercise of religion in this case is not "the least restrictive means of furthering" the state's proffered compelling governmental interest.

■■ While due deference must be accorded prison authorities' assessment of their penological objectives and administrative needs, *Procunier v. Martinez*, 416 U.S. 396, 414–16, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974), inmates maintain, despite their incarceration, certain constitutional protections, including their First Amendment rights. *See Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). Inmates' constitutional protections must be balanced, however, against the interests of prison officials, *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990), and courts are charged with intervention where prison regulations or practices imperil constitutional rights. *Procunier*, 416 U.S. at 406, 94 S.Ct. at 1807–1808 ("When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts [must] discharge their duty to protect constitutional rights." (citations omitted)).

■■ Prison security and penological institutional safety goals are indeed a most compelling governmental interest, and plaintiffs concede as much. *See Procunier*, 416 U.S. at 413, 94 S.Ct. at 1811 (recognizing the "legitimate governmental interest in the order and security of penal institutions"); *Pell*, 417 U.S. at 823, 94 S.Ct. at 2804 ("institutional consideration of internal security within the corrections facilities" is "central to all other corrections goals"). However, defendants cannot merely brandish the words "security" and

"safety" and expect that their actions will automatically be deemed constitutionally permissible conduct. Indeed, "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hac rationalizations will not suffice to meet the [A]ct's requirements." Senate Report at p. 10. Otherwise "[s]eemingly reasonable regulations based upon speculation, exaggerated fears of thoughtless policies cannot stand." House Report.

Defendants argue that beads promote and facilitate gang activity and violence because they are gang identifiers easily displayed to fellow gang members or rivals in the controlled prison setting:

> THE WITNESS: [T]the ability to show their specific colors or to bring that piece that they wore in the streets promotes [gang activity] in our facility.
>
> THE COURT: You have to articulate why. Why can't they do that by merely being members of the gang?
>
> THE WITNESS: If five members know that they are members of gang [*sic*], you are correct that it probably would not make a difference. But if you have a facility that you have 2,000 or 3,000 inmates in it, it is kind of hard. The communication system, even though it is good, it is not very easy, in a yard setting where there is [*sic*] 400 or 500 inmates, for people to pick out who are their particular members.

Testimony of Deputy Commissioner Glenn S. Goord (hereinafter "Goord testimony"), Tr. 25–26.

While I defer to defendants' assessment of the gang situation within the DOCS system, and I accept defendants' assertions that beads are gang identifiers and facilitate gang activities and violence,[12] this portion of defendants' arguments as justification for the entire scope of its directive does not address the essence of plaintiffs' claim. Defendants have not shown how the directive, which prohibits the wearing of beads even under

---

12. Plaintiffs correctly point out that none of the reports proffered by defendants as relating to gang violence relate the violence to the wearing of beads. This absence in the written reports, nevertheless, does not vitiate defendants' conclusion that the wearing of beads facilitates gang communications or poses a threat of promoting violence.

clothing, furthers the state's compelling interest in the least restrictive manner. Plaintiffs convincingly argue that wearing beads under their clothes would address DOCS' concerns. Wearing of the beads in this manner avoids their public display and, hence, the easy identification of gang members, while simultaneously permitting plaintiffs to exercise their religion. I am troubled by defendants' complete rejection of plaintiffs' proposal based on what defendants speculatively describe as an "enforcement problem."

Defendants have not proffered persuasive evidence that wearing beads under clothing poses a security risk. I do not conclude that the possession of beads is less dangerous than the actual wearing of beads under an inmate's clothes; in fact, it may be more dangerous to prison security. Beads, whether rosary or Dhikr, or even crosses or crucifixes, once in the possession of an inmate, may be displayed surreptitiously to facilitate gang identification, while also physically available for use as a weapon or for some other illegitimate purpose. In fact, upon cross examination, Deputy Commissioner Goord conceded that the carrying and display of any item, even if momentary and fleeting, can result in problems for prison administrators. Tr. 49–50.

It is obvious from the record before me that, rather than presenting this Court with some support for their alleged security concerns, defendants have merely articulated a speculative difficulty associated with the enforcement of the directive if they permitted inmates to wear their beads under their clothes:

> [i]t is difficult for us to supervise the officers when we have inconsistent policy. And if I understand your question, I would say what [sic] inmate can wear beads under his shirt, but another inmate can't wear it. It becomes an enforcement problem.
>
> \* \* \* \* \* \*
>
> The ones that are allowed to have the beads, he can possess them. If on a frisk of some kind the officer finds them, he has the ability to say, "O.K., are you allowed to have these," and checks to see. And you

are correct, I don't know how large the number is going to be.

Goord Testimony, Tr. 32–33.

██ Yet, plaintiffs' free exercise of their religion cannot be contingent on administrative inconveniences, where such inconveniences are no greater than those presented by all prison rules. Enforcement problems are inherent in a prison setting whenever a security guard has to enforce any rule, and are no different or greater whether an inmate possesses or wears Santeria beads under clothing as opposed to crucifixes or medals. Perceived preference exists whenever religious practices are recognized and one prisoner gets something another does not. Dietary differences and the penological problems they create are legendary. Apparently the defendants are blind to the existing directive's distinctions amongst various religions and religious practices. These distinctions—distinctions which favor "traditional" over "nontraditional" religions—are more intolerable than any distinction which would permit the wearing of beads by Santeria adherents. The former is based on unfounded assumptions about the genuine character of religious practices while the latter would be based on actual sincere beliefs.

The inmate predisposed to flout prison rules or to challenge the sanctions on the wearing of beads under clothing is likely to do it with crosses and crucifixes. The enforcement problem is the same. In both cases, the discreet wearing of a religious artifact under an inmate's shirt will amount to the same enforcement problem for prison officials. I cannot find any rational distinction between these two situations.

Defendants further fear that they cannot ensure the beads will not be seen or exhibited if worn under clothing is not reasonably based. Defendants' musings that the beads may be viewed when plaintiffs remove their clothes or might be seen through their clothing, are, considered in the most generous light, simply unconvincing. These hypothetical displays would be nothing more than passing occurrences that would not promote the easy gang identification which defendants allege is the reason beads facilitate gang violence.

Remarkably, defendants have not shown that there has been any attempted or actual illicit use by any prison gang of Santeria beads. I am not clear that the beads used by gang members in any way even remotely resemble Santeria beads, either in shape or color. Although defendants claim that beads have been permitted into the system solely for religious purposes, defendants have not shown how the Santeria beads specifically have been used by gangs to facilitate or encourage gang activity. *See* Tr. 45. There has not been anything presented to this Court that shows that the real problem does not stem from some other source, for example gang use of craft and hobby beads, rather than from religious beads, be they Santeria beads or some other devotional article.

Even if defendants had presented cogent and compelling evidence establishing a correlation between the wearing of Santeria beads and gang violence, defendants have failed to dispute plaintiffs' allegations that they are not gang members or that the beads they request to wear do not reflect any known gang colors. Defendants' response to plaintiffs' denial of personal gang association or activity is to hypothesize that plaintiffs' beads may be restrung to reflect gang colors for improper use, and that DOCS is not aware of all the colors which may now, or some time in the future, be designated as a gang membership identifier. Tr. 60–61.

The weakness of defendants' position is evident. The possibility that beads may be restrung in order to reflect gang colors and gang affiliation in no way prevents DOCS personnel from confiscating such beads. In that case, the beads would no longer represent, or be used for, religious devotional purposes. Defendants' further concern that some currently non-existent inmate group may in the future form and adopt colors, or that existing gangs may change colors, to coincide with the colors of plaintiffs' Santeria beads, and then choose to wear them under their clothing without public display, is nothing less than "pure speculation," which, as I have already stated, cannot and should not be the basis for burdening plaintiffs' constitutional rights.

I accept that this Court is bound to defer to prison administrators on questions of prison security needs. I also accept DOCS' assertions that prison gang violence is on the rise and threatens the security of the state's prisons, and further that gangs use beads as member identifiers and that, to this extent, the beads facilitate gang activity. Accepting all this, I am not required, on a motion for preliminary injunction, to indulge DOCS' whims and anxieties about prospective hypothetical situations. *See* Senate Report at 11; House Report. While such claims may later prove sufficient to withstand the plaintiffs' challenge to a carefully considered directive, speculative and uncertain anxieties are simply insufficient, at this time, to sustain a blanket prohibition on wearing beads under clothes. Thus, I find that there is a likelihood that the directive does not embody the least restrictive means to achieve the purported compelling goals of prison security and reduction of prison gang violence.

■■■■ The motion before me presents an opportunity to address defendants' approach to their directive and this litigation. Defendants' responses to the plaintiffs' claims and to questions at the Hearing suggest that, in fashioning their directive, defendants did not adequately investigate and fully understand the Santeria religion. It is significant that the one accommodation of plaintiffs' religion adopted by the defendants—permission to possess beads—is antithetical to plaintiffs' beliefs. The defendants have concluded that there is no significant burden in merely permitting Santeria adherents to possess, but not wear, beads. This view of Santeria, however, completely ignores plaintiffs' claims that it is their sincere belief that they must wear the beads, and that it is the sincere belief of a significant number, if not the majority, of Santeria practitioners that they must wear beads. Defendants ignore the statements by plaintiffs' and their own knowledgeable expert's on this issue. In fact, defendants' expert avers that "Santeria has a long-standing tradition of giving followers the option of wearing or carrying the necklaces." Affidavit of Raul Canizares, ¶ 3. Even a novice, wholly unfamiliar with Santeria, can glean from these documents, and the statements contained therein, that the wear-

ing of beads is a bona fide tenet of a significant number of Santeria practitioners and that the failure to wear the beads is sincerely believed to result in life altering adverse consequences.[13] The beads are not, as defendants would have me recognize, an optional devotional item. Rather, they are a hallmark of plaintiffs' beliefs. Unlike the choice of, or prohibition against, wearing rosary or Dhikr beads, or crucifixes and crosses, only in the case of Santeria beads does the failure to wear them, according to plaintiffs' beliefs, result in negative, and possibly irreversible life consequences for the practitioner.

DOCS personnel, despite their history in the prison system with Santeria adherents, and despite their own expert's evidence and the significant available literature on the subject, appear, at best, ill-informed and indifferent.[14] The following examination of Deputy Commissioner Goord, a coauthor of the directive, is revealing.

Q. How much research did you do before this challenged directive was promulgated in terms of trying to determine exactly what effect these directives would have on the inmates, specifically, on inmate adherents of Santeria? ·

A. Richard Moore, who I believe has an affidavit—I am not sure of the extent of research he did, but he did the research and he was involved, certainly, in setting the policy.

Q. But this directive was under your name?

A. I think it is both of our names.

Q. Did you read any books about Santeria?

A. No, I did not.

Q. Did you speak to any experts about Santeria?

A. I spoke to Richard Moore.

Q. Is he an expert in Santeria?

A. I don't believe so. I don't believe he is.

Tr. 44.

This type of care, or lack of care, in weighing penological interests and religious interests is certainly not of the type commanded by the First Amendment and the Supreme Court in *Church of the Lukumi, see* pp. 16–17, *infra.*

## IV. *The O'Lone/Turner Reasonableness Standard*

■ Even under the *O'Lone/Turner* reasonableness standard it appears, at this pre-

---

**13.** The fact that plaintiffs may practice Santeria in a manner distinct from other practitioners is not, in and of itself, grounds for challenging the genuine character of their religious tenets. Whether plaintiffs represent a minority of Santeria practitioners is of no concern for this Court may not discern the propriety of religious practices, but merely the sincerity of plaintiffs' religious beliefs. *Hernandez v. C.I.R.,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2149, 104 L.Ed.2d 766 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."), citing *Thomas v. Review Bd. of Indiana Employment Security Div.,* 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981). Not every adherent of a religion follows or practices the religion's tenets to the letter. For example, some practitioners of religions with dietary restrictions alter their personal adherence to the parameters of the restrictions. That some adherents choose to follow certain tenets of a religion in a manner different than the majority, does not alter the genuine character of the religious tenet or the importance to the adherent of the manner in which he or she follows the tenet. Here, defendants' own expert recognizes that most adherents wear beads.

Prohibiting adherents from practicing what they genuinely believe to be an integral part of their religion can only be a burden. To argue that it is not is to subject religious belief to an evaluation process of the relative importance of the religious tenets, itself inimical to the First Amendment. *See Thomas,* 450 U.S. at 716, 101 S.Ct. at 1431 ("it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation."). Thus, the number of Santeria practitioners who share plaintiffs' beliefs about wearing beads is not dispositive of the genuine nature of plaintiffs' beliefs. *See Martinelli v. Dugger,* 817 F.2d 1499, 1505 (11th Cir.1987), *cert. denied,* 484 U.S. 1012, 108 S.Ct. 714, 98 L.Ed.2d 664 (1988) (in free exercise of religion case there is no requirement that inmate's belief be shared by a majority of the religion's adherents).

**14.** Defendants' conflicting information is in striking contrast to plaintiffs' counsel's presentation which provided comprehensive references to this Court on Santeria practices, including the wearing versus possession of the Orisha beads.

liminary stage, that the directive is not likely to withstand judicial scrutiny. In *Turner*, the Court set forth the following factors to be considered in determining the constitutionality of a challenged prison regulation:

1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

*Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2262.

Courts are charged under the *Turner* test with determining whether a "valid, rational connection" exists between DOCS' proposed objectives and the challenged directives. *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989). Upon consideration of the parties' assertions and evidence submitted to this Court, and applying the *Turner* factors to this case, I conclude that there is a likelihood that plaintiffs can establish that the directive is unconstitutional.

First, as discussed above, prohibiting the wearing of Santeria beads underneath clothing will not eradicate or significantly minimize attempts at individual gang affiliation or gang violence. There is no rational relationship between those objectives and the prohibition on wearing beads under clothing.

Second, the plaintiffs do not have alternative means to exercise their religion. Plaintiffs have stated under oath that they sincerely believe they must wear the beads, not merely possess the necklaces. *See* Campos Affidavit, ¶¶ 3–7, 12; Lance Affidavit, ¶¶ 3–7, 18. Their expert also states that "*[t]he majority* of followers of Santeria believe that the beads must be worn around the neck in order to protect the 'head' of the wearer." Murphy Affidavit at ¶ 12 (emphasis added). Defendants contend otherwise, but submit only an unpersuasive expert's affidavit which merely states that not all Santeria adherents

wear the beads, or for that matter believe that they must wear them. However, this same expert also notes that practitioners who undergo the initiation to become a "Santero" may be required to wear the beads at all times, thus recognizing that some practitioners do indeed believe they must wear the beads.[15] Affidavit of Raul Canizares, ¶ 3. In short, defendants' expert does not contravene the plaintiffs' claim that many, if not a majority, of Santeria practitioners believe that wearing their beads is an essential and integral part of their religious practices. Moreover, even if plaintiffs' beliefs about wearing the beads is a minority position among Santeria practitioners, their beliefs are, nevertheless, entitled to First Amendment protection. *See Hernandez v. C.I.R.*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (it is not the court's role to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of the tenets); *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 715–16, 101 S.Ct. 1425, 1430–31, 67 L.Ed.2d 624 (1981) (the courts should not assess intrafaith differences); *Martinelli v. Dugger*, 817 F.2d 1499, 1505 (11th Cir.1987), *cert. denied*, 484 U.S. 1012, 108 S.Ct. 714, 98 L.Ed.2d 664 (1988) (minority status of inmate's belief is not significant).

Third, with respect to the impact that accommodating plaintiffs' rights will have on the prison system, based on what the parties have presented to me, I am compelled to conclude that the impact is constitutionally insignificant. In the same manner that defendants monitor and evaluate the conduct of inmates who, under the directive at issue here, are permitted to wear other religious artifacts under their clothing, such as crosses and medals, or who may possess rosary or Dhikr beads, they may similarly oversee the conduct of inmates who wear Santeria beads under their clothing.

Finally, "the existence of obvious, easy alternatives may be evidence that the regula-

---

**15.** Plaintiffs' papers and supplemental submissions suggest that they are Santeros or are undergoing such recognition within Santeria. *See* Lance's Supplemental Affidavit, ¶¶ 11–12; Letter dated April 8, 1994 from Tony Campos to Mr.

Murphy. Thus, defendants' own expert might concede that plaintiffs fall within the category of Santeria adherents he recognizes believe that they must wear beads.

tion is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. As discussed fully above, the wearing of the Orisha beads under the plaintiffs' clothing, out of sight and without intent to display them publicly, is a simple and convenient alternative to an absolute ban on wearing beads. While the mere existence of an alternative is not *per se* evidence that the directive is unreasonable,

> ... if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Id.* at 91, 107 S.Ct. at 2262.

In summary, the directive is not likely to survive review under the *O'Lone/Turner* reasonableness standard. There is a likelihood of success on plaintiffs' claims that the directive simply is not a reasonable response to the concerns the defendants assert herein, as they significantly burden plaintiffs' constitutional rights to the free exercise of their religion and are not reasonably related to legitimate penological interests.

## V. *The Approval Process*

■ Plaintiffs complain that during the pendency of the DOCS' approval procedure, plaintiffs are denied the right to exercise their religion because they are prohibited from wearing, or even possessing, their beads, in violation of their Fourteenth Amendment due process rights. Defendants respond that they acted properly in establishing an approval procedure whereby they may determine the sincerity of plaintiffs' religious beliefs before they are permitted to possess beads.

■ In assessing plaintiffs' claims, this Court must decide "whether the plaintiff was deprived of a protected interest, and, if so what process [the plaintiff] was due." *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir.1988). As set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), there are three factors relevant to this determination:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903 (citation omitted).

Certainly plaintiffs have a protected interest in practicing the Santeria religion and thus in wearing their religious beads. *See Church of Lukumi*, —— U.S. ——, 113 S.Ct. 2217, 124 L.Ed.2d 472 (Santeria practitioners entitled to First Amendment protections); *Cruz*, 405 U.S. 319, 92 S.Ct. 1079 (inmates maintain their First Amendment rights). There is more than an opportunity for an erroneous deprivation here in that there has been an actual deprivation of plaintiffs' beads pending the DOCS approval process, even after local prison administrators recognized the sincerity of plaintiffs' religious beliefs. Finally, there are no additional fiscal and administrative burdens associated with permitting plaintiffs to wear their beads under their clothing while the approval process is completed. According to the defendants, the approval process could be accomplished in a relatively short time, thus, any burden is minimal.

I accept that to properly establish the religious nature of plaintiffs' requests, DOCS must be able to assess the genuine nature of their religious beliefs with respect to the use of beads. However, in this case, DOCS has exercised its authority in an unevenhanded fashion to the plaintiffs' disadvantage for, unlike inmate practitioners of other religions who desire to wear or possess religious items, only Santeria adherents must seek approval for the use of their beads and must forfeit their religious items pending such approval.

DOCS' declared justification for requiring approval by the Central Office, in addition to approval at the facility level, reveals that the approval process, as designed, has more to do with DOCS' administrative inability to

control its staff than with the institutional need to identify genuine religious practitioners. Deputy Commissioner Goord himself testified that he had to inject into the approval process review by his office because of the poor administrative history which characterized the facilities' implementation of the prior religious practice policies.

The policies talked about enforcement. I couldn't control it. I could not control what they were allowing on a facility level, absolutely not, which got me into a position to put out this policy. I finally said to the system, this is our policy. I didn't put myself in to make a determination on a religious tenet. I wanted to make sure that the policy at the facility—not to slow down the process—that I knew was being permitted in the facility. The problem is that, for maybe 14 years or whatever time plaintiff had beads, the facility chaplain or the security supervisors were not following the process. In order to control the gang problem and to get control over the beads, I said, I have to say that I want to look at every one myself.

Tr. 37–38.

In summary, plaintiffs have met their burden of showing a likelihood of success or a serious question on the merits, *albeit* on the narrow and discreet issue of the deprivation of their beads pending completion of the DOCS approval process, to justify preliminary relief.

### VI. *Fourteenth Amendment Violation*

■ Prior to the enactment of the Act, the Second Circuit had held that on an equal protection challenge,

... the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests.

*Benjamin v. Coughlin,* 905 F.2d at 575 (citation omitted). The Second Circuit had, thus, adopted the *O'Lone/Turner* reasonableness test in assessing inmates' Fourteenth Amendment equal protection claims concerning the free exercise of their religion. Whether this standard survives the passage of the Act need not be decided on the instant

motion since I conclude that even under the less rigorous reasonableness test, plaintiffs have satisfied their preliminary injunction burden.

Plaintiffs complain that Directive # 4202 improperly distinguishes between religious medals, crosses and crucifixes and beads. Plaintiffs argue that this distinction is not reasonable because crosses and crucifixes can easily be used as weapons and because the prohibition on beads does not ensure the reduction or elimination of gang activity or violence. Plaintiffs maintain, and invite this Court to conclude, that defendants' actual rationale for these distinctions is tainted by discriminatory motives.

Defendants maintain that DOCS' distinction is based on defendants' conclusions that colored beads are used by gangs to publicly identify themselves and that they facilitate gang activities. I have accepted this justification and accord the appropriate deference due the defendants' assessment of the gang situation in New York's prisons and gang use of beads. There is nothing now before me to suggest that religious medals and crosses, however, are being used or have been used by prison gangs for their notorious activities.

Accepting defendants' distinction between crosses and beads does not conclude the equal protection inquiry. While it is reasonable to treat differently, even preferably, items which, until now, have not been associated with prison gangs and do not impinge on prison security, it strains the outer boundaries of "reasonableness" to prohibit possession of all Santeria beads, including black and white or gold beads, when rosary and Dhikr beads are not so burdened. Defendants have not proffered a valid reason for such a distinction, and on this record I can find none.

Directive # 4202 favors Christian and Catholic symbols and inmates who use or wear such items. I am sympathetic to plaintiffs' claims, and question the apparent bias prominent throughout the directive toward "traditional" Catholic and Christian religious symbols. Nevertheless, I do not agree that DOCS' distinctions between religious medals and beads as contained in Directive # 4202

are wholly unreasonable. To the extent that defendants have justified such preferences based on institutional security concerns, plaintiffs' likelihood of success on the merits is not apparent. However, to the extent that defendants cannot justify a presumption against all Santeria beads, without imposing similar burdens on rosary and Dhikr beads, defendants' distinction is vulnerable to plaintiffs' equal protection claims on the narrow issue of DOCS' disparate treatment of Santeria beads. The Constitution does not countenance such unabashed bias.

## VI. *Conclusion*

For the reasons discussed herein, plaintiffs' motion for a preliminary injunction is **GRANTED.** The defendants are enjoined during the pendency of this action from preventing plaintiffs from receiving in the mail or otherwise, or from wearing their Santeria beads, under their clothing, or from placing them on their shrines, in a manner avoiding the public display of such beads.

**SO ORDERED.**

### *APPENDIX*

Inmates will be permitted to wear only traditionally accepted religious medals, crucifixes, or crosses. The religious medal, crucifix, or cross shall be affixed to a chain only. It is not acceptable to wear religious medals, crucifixes or crosses that are affixed to beads, leather, strings, or rope. Religious medals, crucifixes and crosses shall not exceed the monetary limit for jewelry as set forth in Directive # 4911, *Packages and Articles Sent or Brought into Institutions.* The religious medal, crucifix, or cross on a chain, shall not be of such size or design that can be used as a weapon, conceal contraband, or constitute any other threat to the security or safety of the institution.

All approved religious medals, crucifixes, and crosses shall not be visible and shall be worn underneath clothing at all times.

Rosary beads and Dhikr beads are not considered religious medals, and, as such, may be possessed for prayer and worship, but not worn or displayed. Rosary and/or

Dhikr beads in the color of black only will be permitted.

Other traditionally accepted prayer beads, documented and supported on a theological basis for use in the practice of an inmate's documented religion, may also be possessed, but not worn or displayed. Only those colors documented and supported on a theological basis in the practice of an inmate's documented religions will be considered for approval, pursuant to review by the Senior Chaplain and Deputy Superintendent for Security Services. After the review by the Senior Chaplain and Deputy Superintendent for Security Services, a decision will be made to either disapprove the beads or recommend approval to Central Office. If recommended for approval at the facility level, a photograph and a written explanation regarding the theological basis for the recommended approval shall be forwarded to the Assistant Commissioner for Ministerial Services who will review the facility recommendation with the Deputy Commissioner for Correctional Facilities, at which time approval or disapproval shall be determined. If approved by Central Office, the beads will be registered at the facility and a permit will be issued.

As with religious medals, crucifixes, or crosses, religious beads shall not exceed the monetary limit for jewelry as set forth in Directive # 4911, *Packages and Articles Sent or Brought into Institutions,* and shall not be of such size or design that it can be used as a weapon, conceal contraband, or constitute any threat to the safety of the institution.

All stipulations regarding religious articles shall be consistent with the inmate's documented religion.

Directive # 4911, *Packages and Articles Sent or Brought into Institutions,* will be revised to include the above. As of December 1, 1993, no beads, loose or stringed, will be permitted as art/hobby supplies or in any form other than for religious purposes as specified above.

Additionally, as of December 1, 1993, bandannas and/or colored handkerchiefs will not be permitted. Only solid white hand-

kerchiefs will be permitted. Directive # 4911 is being revised accordingly. Inmates have until March 1, 1994, to send home or dispose of bandannas and/or colored handkerchiefs.

These revisions supersede all prior policy and CORC decisions regarding these issues.