Imam Hamzah S. ALAMEEN, a/k/a
Gilbert Henry, and Robert
Golden, Plaintiffs,

v.

Thomas A. COUGHLIN III, etc.,
et alia, Defendants.

No. CV–94–0965 (CPS).

United States District Court,
E.D. New York.

July 19, 1995.

Leon Friedman, New York City, for plaintiffs.

Dennis Vacco, Atty. Gen. State of N.Y., by David M. Monachino, Asst. Atty. Gen., for defendants.

## MEMORANDUM AND ORDER

SIFTON, Chief Judge.

This is an action brought pursuant to 42 U.S.C. § 1983 by plaintiffs, Imam Hamzah S. Alameen a/k/a Gilbert Henry and Robert Golden, against defendants, Thomas A. Coughlin III, the Commissioner of the New York State Department of Correctional Services, and Bert Ross, the Superintendent of the Arthur Kill Correctional Facility.

The matter is currently before the Court on an application by plaintiffs for a preliminary injunction prohibiting the New York State Department of Correctional Services (DOCS) from enforcing a policy prohibiting the display of black dhikr beads and the possession of such beads of any color other than black. Plaintiffs allege that DOCS' newly implemented policy is both unconstitutional and in violation of the Religious Freedom Restoration Act of 1993, Pub.L. No. 103–141, 107 Stat. 1488, codified at 42 U.S.C. §§ 2000bb *et seq.* ("RFRA").

For the reasons set forth below, plaintiffs' request for preliminary injunctive relief is granted to the extent that defendants are restrained, pending the trial of this case, from implementing a policy which prohibits the display of black dhikr beads incidental to

their use by Sufi Muslims to aid in the reciting or recalling of the ninety-nine names of Allah.

What follows sets forth this Court findings of fact and conclusions of law upon which this determination is based as required by Rule 65 of the Federal Rules of Civil Procedure. The findings of fact are based on the undisputed allegations set forth in both sides submissions on this motion as well as the hearing conducted in this matter on June 22, 1994.

## BACKGROUND

At the time he filed suit, plaintiff Alameen was an inmate at the Arthur Kill Correctional Facility, Staten Island, New York ("Arthur Kill"), a state prison run by DOCS. Plaintiff Golden is currently incarcerated at Arthur Kill Correctional Facility. Defendant Thomas A. Coughlin III is the Commissioner of DOCS. Defendant Bert Ross is the Superintendent of Arthur Kill. Both defendants are sued in their official capacities.

Plaintiffs are practicing Muslims and have brought this action to challenge revisions to

DOCS' Directives Nos. 4202 and 4911, which limit their freedom to use dhikr beads (Muslim prayer beads) while venerating Allah in public settings.[1]

## Procedural History

The directives were phased in according to the following schedule: on December 1, 1993, packages which contained items not in conformity with the new rule would not be accepted; on January 1, 1994, inmates would no longer be able to wear certain religious emblems, and on March 1, 1994, all items not in compliance with the new regulations would be sent home or destroyed.

On May 3, 1994, Judge Sotomayor enjoined DOCS' application of the regulations as applied to beads worn by practitioners of the Santeria faith. *Campos v. Coughlin*, 854 F.Supp. 194 (S.D.N.Y.1994). DOCS was enjoined during the pendency of *Campos* action from preventing plaintiffs in that action from receiving Santeria beads, wearing Santeria beads under their clothing or placing the beads in non-public shrines.

On December 9, 1993, plaintiff Alameen filed a grievance challenging the revised di-

---

1. Directive # 4202 reads as follows:

Inmates will be permitted to wear only traditionally accepted religious medals, crucifixes, or crosses. The religious medal, crucifix, or cross shall be affixed to a chain only. It is not acceptable to wear religious medals, crucifixes or crosses that are affixed to beads, leather, strings, or rope. Religious medals, crucifixes and crosses shall not exceed the monetary limit for jewelry as set forth in Directive # 4911, *Packages and Articles Sent or Brought into Institutions.* The religious medal, crucifix, or cross on a chain shall not be of such size or design that can be used as a weapon, conceal contraband, or constitute any other threat to the security or safety of the institution.
All approved religious medals, crucifixes, and crosses shall not be visible and shall be worn underneath clothing at all times.
Rosary beads and Dhikr beads are not considered religious medals and, as much, may be possessed for prayer and worship, but not worn or displayed. Rosary and/or Dhikr beads in the color of black only will be permitted. Other traditionally accepted prayer beads, documented and supported on a theological basis for use in the practice of an inmate's documented religion, may be possessed for prayer and worship, but not worn or displayed. Only those colors documented and supported on a theological basis in the practice of an inmate's

documented religion will be considered for approval, pursuant to review by the Senior Chaplain and Deputy Superintendent for Security Services. After the review by the Senior Chaplain and Deputy Superintendent for Security Services, a decision will be made to either disapprove the beads or recommend approval to the Central Office. If recommended for approval at the facility level, a photograph and a written explanation regarding the theological basis for the recommended approval shall be forwarded to the Assistant Commissioner for Ministerial Services who will review the facility recommendation with the Deputy Commissioner for Correctional Facilities, at which time approval or disapproval shall be determined. If approved by Central Office, the beads will be registered at the facility, and a permit will be issued.
As with religious medals, crucifixes, or crosses, religious beads shall not exceed the monetary limit for jewelry as set forth in Directive # 4911, *Packages and Articles Sent or Brought into Institutions,* and shall not be of such size or design that it can be used as a weapon, conceal contraband, or constitute any threat to the security and safety of the institution.
All stipulations regarding religious articles shall be consistent with the inmate's documented religion.
Directive # 4911 applies similar restrictions on the sending or bringing of articles into prisons.

rectives as applied to dhikr beads. He complained that the new directives prevented him from possessing dhikr beads in any color other than black and that he was prevented from wearing or displaying the dhikr beads in connection with the practice of his religion. His grievance was initially denied at Arthur Kill and then by DOC's Central Office Review Committee on January 19, 1994.

On February 28, 1994, plaintiff filed the instant action, seeking a temporary restraining order and preliminary injunctive relief to allow him to display and wear dhikr beads in colors other than black. Plaintiff was thereafter appointed pro bono counsel by the Court. The parties then stipulated to allow plaintiff to file an amended complaint. In the interim, plaintiff Alameen was released from Arthur Kill. Although his release rendered his request for preliminary relief moot, the amended complaint added Golden, currently an inmate at Arthur Kill, as a plaintiff. According to his affidavit, Golden is the Imam of Masjid Jidhad at Arthur Kill, the spiritual leader of 204 followers of the Islamic faith at that institution. In addition, the amended complaint seeks certification of a class of all others similarly situated in New York State correctional facilities. To date no motion to certify a class has been filed.

In the amended complaint, plaintiffs contend that the DOCS' directives "substantially burden the inmates' free exercise of religion in the absence of a compelling government interest," in violation of RFRA. Plaintiffs also contend that the directives violate the establishment clause of the United States Constitution and impinge upon their rights under the Equal Protection Clause because the directives allow "traditionally accepted religious medals, crucifixes or crosses" to be worn, while restricting the use of dhikr beads. Plaintiffs contend that "the directives unconstitutionally deem dhikr beads to be of less religious value to Muslims than other religious items are to 'traditionally accepted' religions." Pls.Amended Compl. at ¶ 23.[2]

## The Practice of Dhikr

It is undisputed that Alameen and Golden, like other sincere and devout Sufi Muslims, use dhikr beads in a strand of either ninety-nine or thirty-three beads to aid their practice of reciting the ninety-nine names of Allah. "Dhikr," an arabic word, can be translated as "to remember" and represents the need to remain continuously conscious of the existence of Allah.

> According to plaintiff Alameen,
> Dhikr beads have been used since the beginning of Islam, 609 A.D., but most likely came into [general] use at Medina around 623 A.D. . . . The wives of the Prophet were early pioneers, they noted the Prophet's practice of counting incantations on his fingers with stones and pebbles, and one wife gathered 4,000 date palm stones to count her Dhikr. The best Dhikr is to count with one's fingers, the Prophet's way, but if you will lose count, then all the Islamic jurists agree that Dhikr beads become superior.

While reciting the names of Allah, the beads are held in the hand and a single bead is moved down the strand by finger movement as each name for Allah is recited or invoked. Muslims believe that they must remain mindful of the presence of Allah in order to achieve spiritual purity and heal physical and mental illness. Alameen described the importance of the practice to him and other Sufi Muslims as follows:

> [W]e believe that merely by reciting the formulas of tradition and of the Quran, we are freed of sins and or rewarded for our work. We believe that our life in this world and the hereafter is enriched. Plus the Prophet has prescribed Dhikr for physical and spiritual illness. Because we believe all mental so-called illness to actually be spiritual maladies . . . .

Failure to recite the names of Allah in order and without omissions or repetition has spiritual consequences. As Alameen states:

> We are informed by tradition that the prophet would prescribe Dhikr for Mus-

---

**2.** By motion of July 1, 1993, defendants moved to dismiss plaintiffs' RFRA claims pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing, *inter alia,* that RFRA was unconstitutional. Subsequently, defendants withdrew their constitutional argument; therefore, that argument will not be addressed by the Court.

lims to do a certain number of the times. And we believe if we do more or less [than the prescribed number of incantations] we lose the benefit of that cure. Thus the importance of counting on beads. We must be exact in our Dhikr in most cases.... We were told to do that 5 times per day after every prayer. To exceed [that number] would incur the wrath of Allah; and to be deficient would be to lose the blessing of having all our sins from one prayer to the next forgiven.

In the Islamic faith, a Muslim is required to say obligatory prayers five times a day. These obligatory prayers do not directly involve dhikr beads or the invocation of the names of Allah, however. As explained by Dr. Francis Peters of New York University, an expert in the field:

[I]f you will, there's a distinction, as in all religions, between formal prescribed prayer and voluntary prayer, and in Islam, every Muslim is obliged to pray five times a day, just as every Jew is obliged to pray three times a day. The [dhikr], the beads, or the repetition of the 99 names plays no part in that ritual obligation.

On the other hand, Muslims, like members of other religions, take upon themselves other practices, kind of either voluntarily or customarily, and the [dhikr], the repetition of the names and the use of the beads in connection with that, therefore, is either a question of personal piety or part of the obligations one has assumed by simply being a Sufi—not as being a Muslim, but as being a Sufi.

Peters Dep. at 11. Dhikr is part of the religious observance of Sufi Muslims. *Id.* at 8, 33.

The practice of reciting the names of Allah is not necessarily confined to places of worship or to one's private dwelling. In Alameen's words, "Muslims dhikr while doing all normal activities, like walking or at work performing their duties in their programs." According to the testimony of Golden, Muslims may dhikr in times of stress or trouble wherever they find themselves since dhikr is used to calm or steady the mind. The beads

are not carried for purposes of display or symbolism but as a tool in aiding a lengthy and complex religious ritual. The "display" prohibited by the regulations in connection with dhikr beads is an incidental but inevitable consequence of the use of the beads in a place as lacking in privacy as a prison, since as a practical matter they must be held in the open in order to be counted and to serve their purpose as a visual record of where one is in the ritual. Tr. at 14.[3]

Plaintiffs state that Muslims use beads of various colors for symbolic reasons having no integral relationship to the practice of dhikr. Alameen, who is a member of the Sufi sect, states that he uses white dhikr beads, which symbolize light and life. Other sects use different colors and may change the colors used during certain holidays. According to plaintiffs, red beads are used by Muslims who strive to emulate as closely as possible the life of the Prophet Mohammed, while brown beads are used during particular holidays. For similar reasons, Alameen's beads, like those of some other Muslims, are inscribed with prayers in Arabic script. However, the coloring of the beads and the inscriptions represent a statement by the individual practitioner or his specific order, which can be made in other ways. According to Dr. Peters, color is generally important in Islam, and the color may be chosen by the believer to make a political or religious statement. However, neither Muslim nor Sufi doctrine prescribes a specific color for the beads. Any color may be chosen, though usually traditional colors with particular symbolism are used, and the color (whether black or otherwise) does not affect the actual practice of dhikr.

### DOCS' Directives

Defendants defend their restrictions on the display of dhikr beads on the grounds that they are necessary to confront growing problems posed by prison gangs because of the use by gangs of color beads (as well as bandannas and other items of clothing) for identification and organizational purposes. In the past few years, there has been an

---

**3.** THE COURT: Excuse me. You can't use the beads in your pocket? Why is that?

THE WITNESS: You have to see the beads in order to keep the calculation.

increasing number of gang-related incidents of violence and disorder within the New York State prison system. According to Glenn S. Goord ("Goord"), Deputy Commissioner for Correctional Facilities of DOCS, there has been a recent "marked increase" in the formation and size of gangs within prisons. Goord Aff. at ¶ 3. In his affidavit, Goord states that

> [t]he formation of and participation in such unauthorized gangs within correctional facilities can produce factionalism, hostilities and rivalries among inmates, which can erupt into violent or potentially violent incidents. It can also create power bases among specific groups of inmates, which can be used to wield power over other inmates in order to force them to surrender property or to perform favors for the inmates in power.

Goord Aff. at ¶ 3; Roy Aff. at ¶ 6 ( [G]ang-related incidents present "a serious risk to the lives and safety of inmates and staff."). Commissioner Goord has appended to his affidavit four incident reports to illustrate gang-related problems.[4] The first report describes an alleged attack by members of the Latin Kings on an inmate who was violating their code and who may have stolen or withheld drugs from them. The second report describes a near riot after a large group of over 200 Hispanic inmates attacked a smaller group of black inmates. The report does not mention specific gang affiliations. The third report describes an inmate found with a weapon who said that the Latin Kings had put out a contract on his life. The fourth report describes a fight among approximately fifty inmates described as Latin Kings, although it does not make clear whether the fight was among Latin King members or between gang and non-gang members. Goord Aff.Ex. C. In addition, the growing problems caused by prison gangs have been noted by the lay press.[5]

Plaintiffs do not dispute that one method by which gangs identify their members both to each other and to members of other gangs is by wearing or displaying "colors" to indicate an affiliation with a specific gang. The record includes documents confiscated from prisoners that describe the use of beads as an indicator of gang activity. Roy Aff.Ex. C. This exhibit describes the black and gold beads that members of the Latin Kings use to signify their membership and their progress through the ranks. A document identified as an informational sheet from the Neta gang describes the all white necklace and five black beads that indicate membership in that group. Roy Aff.Ex. D.

Revised Directives Nos. 4202 and 4911, adopted by DOCS on November 29, 1993, limit the ability of gang members to use colored beads to display their gang affiliation. Under the directives, inmates may possess dhikr and rosary beads only if they are black and may use such beads for prayer or worship only if the use does not involve wearing or displaying them.

The directives do permit inmates to wear "traditionally accepted religious medals, crucifixes, or crosses" as long as they are affixed to a chain (but not to beads, leather, strings or rope) and are not "of such size or design that can be used as a weapon, conceal contraband, or constitute any other threat to the security or the safety of the institution." Any medal, crucifix, or cross must be worn under clothing at all times and remain out of sight. However, the revised directives specifically note that "Rosary beads and Dhikr beads are not considered religious medals and, as such, may be possessed for prayer and worship, but not worn or displayed. Rosary and/or Dhikr beads in the color of black only will be permitted."

According to Goord, the purpose of the revised directives is to prevent "gangs from obtaining colored beads ostensibly for religious purposes and then using them as a display of gang-related colors." Goord Aff. at ¶ 4. As Goord testified,

---

4. None of which, incidentally, is recorded as involving the display of colored beads.

5. *See generally*, Craig Horowitz, *The Dirty Secret of Cellblock 6*, New York Magazine, Oct. 10, 1994, at 28; Mireya Navarro, *The Inmate Gangs*

*of Rikers Island*, N.Y. Times, May 8, 1994, at 29. Both of these articles are worthy of note if only because they include photographs of self-described gang members wearing colored beads.

the system was experiencing problems with gang-related incidents and unauthorized group organizations. And the major reason for those revisions was to get control over the fact of beads and other religious items, religious medals in particular, because those items were used and—for notating what groups people belonged to. Tr. at 46.

Since color schemes used by gangs change, DOCS is not always aware of their significance and has chosen to ban all colors other than black rather than attempt to keep up with gang affiliations. Because black can be used with other colors as a gang identification color, DOCS chose to impose a blanket restriction on the wearing and displaying of even black beads, even though the regulations allow the possession of black dhikr beads.

As interpreted, the display prohibited by the regulations does not include display in places of worship or in one's prison cell when the beads are actually in use by the prisoner to dhikr.

> The intent of the word display ... was meant to talk about how they could show [beads] in their cell or cubicle, whatever. That we didn't want people hanging even authorized beads from their cell bars, in some cases, or from ... places as that type of display.

> It certainly was not intended to mean that during a religious service, [an] approved religious service. And certainly when the inmate is in his cell, or in his cubicle, that he could not display them while he's praying with them, or in this case, dhikring with them.

Tr. at 48. On cross-examination, Goord acknowledged that, while using the beads to pray in a cell or cubicle would be permitted under the directives, dhikring with the beads in a public place such as a mess hall would be a violation. Tr. at 55. Plaintiffs' witness, Sheik Ismail Rasheem, a chaplain at Arthur Kill, testified that adherents felt that under the directives they could not use the beads to pray in public. Tr. at 29. Similarly, in their brief, defendants acknowledge that plaintiffs are permitted to carry the beads in their pockets but must not remove them to dhikr in any place other than a place of worship or their cell.

## DISCUSSION

■ In the Second Circuit, a party seeking preliminary injunctive relief must show that irreparable harm will result from a failure to grant injunctive relief and either (1) likelihood of success on the merits or (2) sufficiently serious questions making a fair ground for litigation with a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Jackson Dairy v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979); *Campos v. Coughlin,* 854 F.Supp. 194, 203–04 (S.D.N.Y.1994).

### The Religious Freedom Restoration Act

■ Both the issue of irreparable injury and the issue of success on the merits require consideration of the constitutional and statutory framework of plaintiffs' action. Plaintiffs seek relief both under RFRA and under the Supreme Court First Amendment decisions that preceded it. The two are interrelated since RFRA established a new statutory standard to be used when balancing government interests and individual religious freedoms. RFRA was in fact enacted with the express purpose of restoring the "compelling interest" test articulated by the Supreme Court in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). 42 U.S.C. § 2000bb(b)(1). The compelling interest test had, in Congress' view, been considerably weakened by *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which, according to a finding of Congress, "virtually eliminated the requirement that government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. § 2000bb(a)(4). Before enactment of RFRA, a prison regulation curtailing freedom of worship or religion was deemed valid as long as it was reasonably related to legitimate penological interests. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349–350, 107 S.Ct. 2400, 2404–05, 96 L.Ed.2d 282 (1987). The Senate Report specifically states that the intent of the Act is to

overrule *O'Lone.* S.Rep. No. 111, 103rd Cong., 1st Sess., *reprinted in* 1993 U.S.C.A.A.N. 1892, 1898.

District courts that have examined the issue since the statute's enactment have concluded that RFRA applies to prison regulations. *See Hamilton v. Schriro,* 863 F.Supp. 1019 (W.D.Mo.1994); *Campos v. Coughlin,* 854 F.Supp. at 205; *Lawson v. Dugger,* 844 F.Supp. 1538, 1542 (S.D.Fla.1994); *Allah v. Menei,* 844 F.Supp. 1056, 1061 (E.D.Pa.1994); *Muslim v. Frame,* 891 F.Supp. 226, 228–29 (E.D.Pa.1995). The application of RFRA in the prison context was discussed by the Senate at length in Senate Report 103–111, *reprinted in* 1993 U.S.C.A.A.N. at 1898.

The committee does not intend the act to impose a standard that would exacerbate the difficult and complex challenges of operating the Nation's prisons and jails in a safe and secure manner. Accordingly, the committee expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

At the same time, however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements.

*Id.* at 1899–90.[6]

Congress thus intended courts applying RFRA to take into account the competition between inmates' First Amendment rights and prison officials' need to maintain an orderly and secure prison environment.

RFRA provides:

(a) In general—Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception—Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

    (1) is in furtherance of a compelling governmental interest; and

    (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1. "Government" is defined as including departments and agencies of a state or a subdivision of a state. 42 U.S.C. § 2000bb–2.

### Irreparable Harm/Substantial Burden

█ In general, infringement of constitutional rights constitutes irreparable injury. *See Elrod v. Burns,* 427 U.S. 347, 373–374, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976); *Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir.1991); *see also* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 440 (1973) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary"). Prisoners do not forfeit constitutional claims because of their convictions. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Similarly, a finding under RFRA that a regulation creates a

---

6. The deference due prison officials was recognized before *O'Lone.* As the Supreme Court wrote in *Pell v. Procunier:*

> We start with the familiar proposition that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." In the First Amendment context, a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Campos,* 854 F.Supp. at 207.

substantial burden on an individual's exercise of his or her religion constitutes a finding of irreparable harm. *See Prins v. Coughlin,* CV–94–2053, 1994 WL 411016 *2 (S.D.N.Y. Aug. 3, 1994).

■ To receive First Amendment protection, a belief must be rooted in plaintiff's religion. Nevertheless,

> the determination of what is a "religious" belief or practice is more often than not a difficult and delicate task.... [T]he resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.

*Thomas v. Review Bd. of the Indiana Employment Security Div.,* 450 U.S. 707, 713–14, 101 S.Ct. 1425, 1429–30, 67 L.Ed.2d 624 (1980). Moreover,

> the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Id.* at 715–716, 101 S.Ct. at 1431; *see also Hernandez v. C.I.R.,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989) ("It is not within the judicial ken to question the centrality of religious beliefs or practices to a faith or the validity of particular litigants' interpretation of those creeds."); *Martinelli v. Dugger,* 817 F.2d 1499, 1505 (11th Cir. 1987) ("Although appellant may be correct in arguing that [hair length and kosher diet] are optional practices in the Greek Orthodox religion, there is no requirement that a belief be held by a majority of the believers in a particular religion."), *cert. denied,* 484 U.S. 1012, 108 S.Ct. 714, 98 L.Ed.2d 664 (1988); *Muslim,* 891 F.Supp. at 230–31 (RFRA plaintiff "need only show that the practice at issue is religiously motivated").

■ Still, to impose a substantial burden, government interference must be more than an inconvenience. The interference must burden a belief central to a plaintiff's religious doctrine. *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1393–94 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 510, 130 L.Ed.2d 417 (1994).

■ Plaintiffs here have demonstrated that the regulations impose a substantial burden on the practice of dhikr. The practice of dhikr and the use of the beads are accepted and recognized practices of many Muslims to assist them in maintaining a constant awareness of Allah. Forcing plaintiffs to dhikr on their fingers or without the assistance of any *aide-memoire* is not an adequate substitute for the use of beads to keep track of their recitations because of the importance of ritual in the Muslim faith. To be used, the beads must be held and counted within the view of the practicing adherent, for both religious and practical reasons.[7] Tr. at 14; *see supra,* n. 3. Because these regulations effectively prevent plaintiffs from the practice of dhikr during their daily activities—a practice in which they believe they should, as a matter of their religious tenets, engage— plaintiffs are suffering irreparable harm.[8]

---

7. Indeed, the DOCS directives seem based on a faulty factual premise. Reverend Moore, an Assistant Commissioner at DOCS who assisted in the preparation of these regulations, attests that "to my knowledge there is no religious tenet or practice requiring that Dhikr beads should be displayed or worn." Moore Aff. ¶ 5. Moore concludes that the directives "are consistent with the traditionally accepted uses of Dhikr beads, for they do not prohibit a practicing Muslim from possessing and carrying Dhikr beads for prayer or meditation purposes." Similarly, in their memoranda, defendants state that "[t]he beads need only be held in the believer's hand. The DOCS directives allow inmates to carry beads in their pocket and pray when necessary...." These conclusions are inconsistent with the testimony and evidence presented by plaintiffs as to the practice of dhikr.

8. Aside from the injury to their constitutional rights to free exercise of their religion, Sheik Rasheem, the chaplain at the Arthur Kill Correctional Facility, testified that inmates dhikr for spiritual solace:

> Q. Now are the adherents encouraged to dhikr outside the mosque area?
> A. For the—for its therapeutic value, I do instruct them. Sometimes you have inmates who have behavior problems. So

## Likelihood of Success/Serious Questions to the Merits

■ The second prong of the requirement for a preliminary injunction considers likelihood of success or the existence of serious questions going to the merits plus the balance of equities between the parties.

DOCS asserts that plaintiffs cannot avail themselves of the "serious questions" portion of the preliminary injunction standard. Relying on *Union Carbide Agr. Products Co., Inc. v. Costle,* 632 F.2d 1014, 1018 (2d Cir. 1980), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981), defendants contend that, when a party seeks to enjoin "governmental action that is in the public interest," the moving party must show a likelihood of success on the merits before an injunction will be issued. In response, plaintiffs rely on *Haitian Centers Council, Inc. v. McNary,* 969 F.2d 1326, 1338–1339 (2d Cir. 1992), *rev'd and remanded on other grounds,* —— U.S. ——, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993), to suggest that the Court of Appeals for this Circuit has moved away from the use of the higher standard expressed in *Costle.*

Both sides have failed to explore the different settings presented by the cases they rely on. In *Haitian Centers Council,* the court distinguished the case of a government agency acting pursuant to a broad grant of authority (such as the power to exclude aliens granted by immigration laws) from the case of a government agency acting pursuant to the narrower grant of authority pursuant to a specific state or federal statute. 969 F.2d at 1339. Where an agency is acting pursuant to a broad grant of authority, the court said that "no party has an exclusive claim on the public interest." *Id.* The Court held that

the " 'likelihood of success' prong need not always be followed because a movant seeks to enjoin government action." Here, defendants justify their conduct on the grounds that they are acting in the public interest, broadly defined, and have not pointed to any specific "statutory or regulatory scheme" requiring their regulations. *Plaza Health Lab., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989); *see generally Toy Manufacturers of America, Inc. v. Richard Blumenthal,* 806 F.Supp. 336, 340 n. 3 (D.Conn.1992), *aff'd,* 986 F.2d 615 (2d Cir.1992). Accordingly, plaintiffs may avail themselves of either prong of the test. On the facts presented here, however, plaintiffs are entitled to a preliminary injunction under either analysis.

### RFRA Claims

With respect to plaintiffs' RFRA claims, the first question is whether or not the regulations impose a substantial burden on plaintiffs' First Amendment rights. As discussed above, prohibiting the plaintiffs from holding beads in their hands so that the beads might be seen and counted constitutes a substantial burden on their practice of religion.[9]

Once plaintiffs have shown that their rights are substantially burdened, defendants must justify this burden on plaintiffs' religious practice by showing that the restrictions further a compelling interest and are the least restrictive alternative. *Hamilton,* 863 F.Supp. at 1022.

■ Defendants have established a compelling interest at stake here: the undisputed evidence establishes that gang-related violence poses a threat to the security of guards and other prisoners. The existence of a separate and independent system of authority

therefore they need to change their behavior. And I find that the Dhikr historically has been used to change one's calm ... and harmonize one's behavior.... [Adherents may] giv[e] a personal dhikr for themselves in order to bring about some type of behavior modification.
Tr. at 27. *Cf. Hamilton,* 863 F.Supp. at 1022 ("The practice of [Native American rites] has the same beneficial effect on its adherents as do other religions for their adherents. Within the prison system, it has the benefit of promoting inner peace, has a calming effect and causes the

practitioner to become a more cooperative, peaceful, self-controlled individual.").

9. Plaintiffs have not established—indeed, it is not clear that they claim—that the prohibition on their wearing or displaying the beads when they are not in use to recall the names of Allah constitutes a substantial burden on any religious freedom. Nor have plaintiffs established that requiring the beads to be black substantially burdens their exercise of their religion since the choice of one color over another is not integral to the practice of dhikr.

directly threatens the security and stability of the institution as a whole, and it is undisputed that wearing identifying colors in the forms of beads provides an organizing device which is subversive of prison authority.[10] Since beads are used as a symbol of identity, unity, and authority by various gangs, prison officials have a compelling interest in restricting the use of the beads.[11] The gangs pose a direct threat to prison authority as catalysts for violence and disorder, and prison officials are entitled to take measures to inhibit gang activity.

While defendants have established a compelling need to prevent the use of dhikr beads by gang members to display their colors, they have not shown a likelihood of success in demonstrating that the same objective cannot be accomplished by an alternative which is less restrictive of plaintiffs' rights, namely, the prohibiting of the display of dhikr beads *except* in connection with the practice of dhikr.

The only reservation defendants articulate concerning a prohibition which hinges on the use of the beads by practicing Muslims in the course of reciting the names of Allah is that any display even for religious purposes will cause gang members to steal the beads and then re-string them and use them to display gang colors. This argument rests on an unproven assumption about the lack of availability of beads or of other means of displaying gang colors which is simply not borne out by the record in this case. Even the hypothesis that gang members will re-string plaintiffs' black beads with beads of other colors assumes that gang members can readily obtain beads in colors other than black without difficulty, using plaintiffs only as a source of black beads. The idea that gang members will adopt the color black alone to display their allegiance or engage in the practice of dhikr as a subterfuge for displaying their colors is not seriously advanced here and is, in all events, an inadequate basis for rejecting the least restrictive alternative proposed for reasons stated by Judge Sotomayor in *Campos*, 854 F.Supp. at 209:

> The weakness of defendants' position is evident. The possibility that beads may be restrung in order to reflect gang colors and gang affiliation in no way prevents DOCS personnel from confiscating such beads. In that case, beads would no longer represent, or be used for, religious-devotional purposes. Defendants' further concern that some currently non-existent inmate group may in the future form and adopt colors, or that existing gangs may change colors, to coincide with the colors of plaintiffs' Santeria beads, and then choose to wear them under their clothing without public display is nothing less than "pure speculation."

The idea that prison authorities will be unable to distinguish the bonafide practice of dhikr from the showing of colors by gang members is, at this stage of the proceeding at least, the product of speculation by (what one suspects) are non-Muslims dealing with unfamiliar ritual. It is precisely because of Congress' fears that lack of contact with unfamiliar religious practices might lead to the suppression of such practices on insuffi-

---

10. None of the reports provided by the parties at trial clearly documented the use of colored beads as a device for establishing gang membership. After the hearing, the Court drew the parties' attention to a newspaper article appearing in the New York Times Magazine. *See* Adrian Nicole LeBlanc, *Gang Girl*, N.Y. Times Magazine, Aug. 14, 1994, at 26. Neither side disputed the depiction in the article of the use of colored beads by gang members to display their allegiance, and defendants responded with a news article discussing gang problems at Riker's Island, including the statement that "there is no attempt to hide group affiliation. Beads are worn openly around the neck: black and gold for the Latin Kings, white, red, and black for the Netas." Mireya Navarro, *The Inmate Gangs of Rikers' Island*, N.Y. Times, May 8, 1994 at 9.

11. *Cf. Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), where the Supreme Court recognized the pre-eminent interest of the military in maintaining obedience and uniformity through the control of dress and apparel. In *Goldman*, the Supreme Court upheld the determination of the Air Force that the plaintiff, an Orthodox Jew, could not wear a yarmulke indoors. *Goldman* was later overturned by statute. 10 U.S.C. § 774. However, the interests at issue in *Goldman* are a shadow of the concerns of defendants here—the use of the beads by organized gangs are a direct challenge to the obedience and uniformity that are essential to the orderly and secure operation of the prison.

cient grounds that RFRA cautions against the use of speculation to justify limitations of the free expression of one's religion.

### First Amendment and Equal Protection Claims

■ Plaintiffs have also claimed that the directives violate their First Amendment rights and their right to equal protection. The First Amendment claims are evaluated according to the standards set forth in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *O'Lone v. Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Although it is unnecessary to reach this constitutional issue, I am satisfied that this standard provides plaintiffs with no additional relief. Prison regulations have to be "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261. The constitutionality of the regulations depends on (1) whether a "valid, rational connection" exists between the prison regulation and the "legitimate" government interest as claimed, (2) whether alternative means exist for prisoners to exercise the right in question, (3) the "impact of accommodation" of the asserted right, and (4) whether there are "ready alternatives" available to satisfy both the inmate's rights and penological interests. *See Fromer v. Scully,* 874 F.2d 69, 72 (2d Cir.1989). As noted above, the directives are in support of a legitimate interest and are rationally connected to that interest. Plaintiffs have alternatives to wearing beads and to the use of colored beads, and while the impact of accommodating colored beads would be high, the impact of accommodating black beads held and displayed only for prayer would be minimal. DOCS has no ready alternative to eliminate this manifestation of gang independence; allowing colored beads increases the potential for theft, violence, and use of the beads for improper purposes.

■ Plaintiffs' equal protection claims also do not afford a different relief at this preliminary stage. Distinctions between religious groups may be upheld if such distinctions "are reasonably related to legitimate penological interests." *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990). Dhikr beads are specifically mentioned in the regulation and are treated identically to rosary beads, which are symbols of a "traditional" religion. Dr. Peters has testified that the beads serve analogous purposes in different religions. The directives reasonably treat them similarly with each other and differently from religious medals and crosses. While Dhikr beads (and rosary beads) are treated differently from "traditionally accepted" medals and crosses, this difference is grounded in both penological interests and religious practice, since it is beads (not medals) that are the primary symbols of gang identification and since the beads derive their meaning from use and not from merely being worn.

### CONCLUSION

For the foregoing reasons, defendants are enjoined and restrained pending the trial of this matter from enforcing DOCS' Directives Nos. 4202 and 4911 to prevent the display of black dhikr beads incident to their use by individual inmates to keep track of the inmate's place in the recitation of the names of Allah.

The Clerk is directed to enter a separate order of preliminary injunction in the form annexed hereto and to mail a copy of both to all parties.

SO ORDERED.