**UNITED STATES of America**

**v.**

**Michael MARKS, a/k/a David Marks.**

**Criminal Action No. 96–361–1.**

United States District Court,
E.D. Pennsylvania.

Nov. 26, 1996.

Ewald Zittlau, U.S. Attorney's Office, Philadelphia, PA, for the Government.

Thomas J. Eoannou, Buffalo, NY, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

Before the Court is defendant Michael Marks's motion for reconsideration of our denial of bail pending his sentencing. After a hearing today and for the reasons discussed below, the motion is denied.

### I. Factual Background

On August 15, 1996, defendant Michael Marks [1] was indicted on a ten-count indict-

---

1. In addition to Michael Marks, other members of his family were also indicted in connection with this case, to wit, his paramour, Maria Marks, and her grandfather, Steve Eli Ristik; Michael Marks's father and recently deceased

ment charging wire fraud,[2] interstate transportation of securities obtained by fraud, conspiracy to defraud the United States, and attempt to launder monetary instruments. On November 18, 1996—the day scheduled for the start of his trial in this case—the defendant pled guilty to all ten counts of the indictment.

The charges stem from unusual facts which bear detailed exposition because the fraudulent acts to which the defendant has pled guilty to having committed are a significant factor in our decision to deny the defendant's motion for release on bail pending his sentencing scheduled for March 4, 1997. These facts are those the defendant admitted at his change of plea hearing.

In mid-June of this year, Donna M. Hillier, an eighteen year college freshman at the University of Maryland, visited "Madam Flora," a fortune-telling establishment located on Route 1 in College Park, Maryland. There she met Dorin, a fortune teller who, after performing a "reading", informed Hillier that she was afflicted by "negativity." Hillier paid Dorin forty-five dollars for these services.

A few days later, Hillier returned to Madam Flora and was introduced to Dorin's "sister", Selen, who Hillier later identified as Maria Marks, defendant Michael Marks's paramour. Selen was able to identify the source of Hillier's "negativity." Selen told Hillier that about two thousand years ago, Hillier (presumably in a former life) gave information to royalty about a peasant uprising, which resulted in the massacre of these unnamed peasants and Hillier being cursed (presumably by the massacred peasants' surviving families). According to Selen, this curse, if not removed, would turn into a fatal disease. After this first session, Hillier became a frequent customer of Madam Flora's and Selen's services, returning every day for at least a dozen days.

Selen soon discovered how to "remove" the negativity and resulting curse afflicting Hillier. Selen instructed Hillier to take two thousand dollars in cash and wear it on her person for a day. After doing so, Hillier gave the cash to Selen, who never returned it. This apparently did not do the trick. Hillier then informed Selen that she had received money as a result of her father's wrongful death. Selen told Hillier that the curse could be removed if Hillier wrote out two checks for a total of two hundred thousand dollars, which Selen would take into meditation. On July 2, 1996, Hillier wrote two checks for one hundred thousand dollars each and gave them to Selen. In conformity with Selen's instructions, Hillier left the payee line blank and went to her bank to transfer sufficient funds into her checking account to cover the checks. This was necessary, according to Selen, to remove the curse and destroy the negativity.[3]

The next day, July 3, 1996, the defendant Michael Marks telephoned a check cashier (who was a cooperating witness) in Philadelphia and explained that he had two checks for one hundred thousand dollars each which he wanted to cash without filing any currency transaction reports with the Internal Revenue Service.[4] After several telephone calls (which the check cashier recorded) over the span of several days, Michael Marks agreed to pay a fee of five percent to the check cashier for cashing the checks without completing any currency transactions reports, as well as a flat fee of $2,500 to a banker in order to insure that the checks would be cashed without law enforcement detection. When Michael Marks, Maria Marks and Steve Eli Ristik met the check cashier on July 16, 1996 to collect the proceeds of Hillier's checks, they were arrested.

Following Michael Marks's indictment on July 18, 1996, Magistrate Judge Tullio Gene Leomporra ordered his detention without

---

mother were indicted in a case assigned to Judge Brody.

**2.** The Government indicted Michael Marks on eight counts of wire fraud.

**3.** Hillier did not intend the checks to be a fee for removing the curse and expected that the checks

would be returned—in full—once the curse was removed.

**4.** Currency Transaction Reports are required to be completed for each transaction involving more than ten thousand dollars.

bail. On August 16, 1996, Magistrate Judge Diane M. Welsh denied Michael Marks's motion for reconsideration of Magistrate Judge Leomporra's detention order, but on August 26, 1996, Magistrate Judge Welsh reversed herself and set conditions for Michael Marks's release on bail. Magistrate Welsh's Order was stayed pending the Government's appeal, pursuant to 18 U.S.C. § 3145(a), to this Court. On September 4, 1996, after a *de novo* hearing on Michael Marks's motion for release on bail pending his trial, we ordered the defendant's detention. On November 18, 1996, defendants Michael Marks, Maria Marks and Steve Eli Ristik pled guilty to all counts of the indictment against them. At that time, we denied Michael Marks's oral motion for bail pending his sentencing, which we scheduled for March 4, 1997.

## II. *Basis of the Instant Motion*

Yesterday, November 25, 1996, Michael Marks's attorney, Thomas J. Eoannou, Esquire, filed a motion and affidavit seeking Michael Marks's release pending his sentencing. We held a hearing this day on defendant's motion. The motion is premised on the religious obligations facing Michael Marks now that he has learned of his mother's death.

On October 20, 1996, while on bail, Janet Marks, Michael Marks's late mother, who was a defendant in the case before Judge Brody, was killed by an automobile in New Jersey. Michael Marks's motion for reconsideration of our prior denial of bail is based on his need to lead the *pomana*—the "black feast"—which is said to be the traditional mourning ceremony of the Romani–American or "Rom" (commonly, and perhaps incorrectly, known as "gypsies") that is held at six weeks, six months, and one year after the death of a family member. The first black feast for Janet Marks is scheduled for December 1, 1996, six weeks after her death.

In support of his motion, Michael Marks has submitted as an exhibit the unnotarized affidavit of Ruth E. Anderson, Ph.D., who, according to Mr. Eoannou's affidavit, is a noted scholar of "Gypsy" life and culture. Dr. Anderson explains in some detail the history and religious beliefs of Romani–Americans, which we now rehearse.

Romani–Americans trace their roots to a people who left India before 900 A.D. and have since experienced a diaspora which has scattered them throughout the world. Michael Marks's family is said to trace its roots to a sub-group called the *Kalderasha* (or Russian Coppersmiths) that immigrated to the United States at the turn of this century. Although relatively little is known of the *Kalderasha,* according to Dr. Anderson, they are a traditional folk group that adheres to longstanding customs, traditions and religious beliefs.

For our purposes, the most important aspect of the *Kalderasha*'s culture is their religious observances upon the death of a family member. We quote extensively from Dr. Anderson's statement explaining what Michael Marks is required to do in preparation for his mother's black feast.

The Rom believe that when someone dies, in order to prevent the displeasure of God and of the spirits of the dead, certain practices must be performed. Following his mother's death, an eldest or only son must:

1) Wear plain black clothing for one year....

2) Remain at home with extended family members in a large group, showing respect for the deceased by praying, burning holy incense (*tumuya*) over all meals that are consumed, refraining from any form of entertainment (no TV, radio, or parties), and receiving calls and visits from family members who have come from far away in honor of the deceased.

3) Provide hospitality in the form of elaborate food and a place to stay for visiting family members, often including paying for hotel rooms and other expenses....

4) Gather together all the deceased's clothing, transport it to a river or other body of moving water, and cast it in, while saying special prayers for the dead.... For the Rom, this practice is possibly specifically rooted in Hindu beliefs regarding the sacred River Ganges.

5) Select an appropriate person to wear a new suit of clothing, purchased in honor

of the deceased, at the six-weeks black feast. This person appears as a symbolic manifestation of the dead person. Others honor the deceased by speaking with that person, apologizing for any harm that has been done, and generally having a last opportunity to repair relationships so the soul can be at peace. This custom is probably based in the Hindu belief that the state of mind near the time of death determines the next incarnation.

6) Buy the clothing for the symbolic person to wear and burn incense over it for purification.

7) Rent, or otherwise arrange for, a place for each of the three black feasts to take place. This usually involves negotiating with hotels to find a suitable banquet room with space for several hundred people to gather and eat, and appropriate fruit displays, flowers, and decorations. Often, the room must have kitchen facilities attached that the family can use. Some food may be bought from the hotel, but special foods must be prepared by the men of the family as well. Materials are purchased and decorations are made by hand by the family, all coordinated by the deceased's son.

8) Arrange for a special place setting at the table in memory of the deceased....

9) Arrange for relationships of all family members to continue in ways that would please the deceased, including proper care of the deceased's children (if not yet grown), or grandchildren, if any, and proper attention to the physical and psychological well-being of the deceased's surviving spouse.

10) Make certain that all rituals and activities are carried out in a respectful, timely, caring, and worshipful manner that shows deference to the deceased and to God.

Anderson Aff. ¶¶ at 3–4. Romani–Americans believe, according to Dr. Anderson, that if Michael Marks does not undertake these tasks, "suffering will descend upon the entire family, and the mother's spirit (the *muli*) will be unable to rest. It will travel the earth, experiencing pain itself, haunting the family, and causing intense pain to friends and loved ones until the appropriate tasks are finally done. As a consequence, also, David [Michael] Marks will lose all meaningful status within his family and will become an outcast, completely outside the family group for an indefinite period, probably the rest of his life." Anderson Aff. at 4.

Michael Marks's attorney goes so far as to attest in his affidavit that Michael Marks's religious preparations for the black feast provide "a kind of cultural surety for David [Michael] Marks that precludes a determination that he is a risk of flight or will otherwise fail to appear for this court's sentencing determination on March 4, 1997." Eoannou Aff. at ¶ 15.

As bail, the extended Marks family is willing to post the title to two houses and one hundred thousand dollars in cash. Specifically, Michael Marks's maternal uncle and aunt, Richard and Judy DeMetro, are willing to pledge their family residence located at 100 Chestnut Avenue, Cherry Hill, New Jersey and execute an agreement to forfeit the property, pursuant to 18 U.S.C. § 3142(c)(1)(B)(xi), in the event Michael Marks fails to appear for his sentencing. *See* Eoannou Aff. at ¶¶ 23 & 26. The Cherry Hill residence is assessed at two hundred and eighteen thousand dollars. *See id.* In addition, Michael Marks's paternal uncle and aunt, Nick and Rose Marks, are prepared to pledge their house at 6602 Franconia Road, Springfield, Virginia, and also execute an agreement to forfeit the property, pursuant to § 3142(c)(1)(B)(xi), in the event Michael Marks fails to appear for his sentencing. *See id.* at 25. Finally, the DeMetros are prepared to post one hundred thousand dollars cash (said to be the proceeds of an insurance policy on their recently-deceased father) as bail and to execute a forfeiture agreement. *See id.* at 24. The DeMetros are also prepared to support and supervise Michael Marks until his sentencing. *See id.* at ¶ 23.

III. *18 U.S.C. § 3143*

Because Michael Marks has pled guilty to the ten counts in the indictment against him, we must analyze his motion for bail under 18 U.S.C. § 3143, which, in relevant part, provides that "a person who has been found guilty of an offense and who is awaiting

imposition or execution of sentence" shall "be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community. . . ."

The statute has three significant features. First, § 3143(a) creates a presumption in favor of detention pending sentencing. *See United States v. Miller,* 753 F.2d 19, 22 (3d Cir.1985) ("The [1984] Act was enacted because Congress wished to reverse the presumption in favor of bail that had been established under the prior statute, the Bail Reform Act of 1966."); *United States v. Giampa,* 904 F.Supp. 235, 357 (D.N.J.1995); *United States v. Holtz,* No. 92–459, 1995 WL 106895 (E.D.Pa. March 13, 1995).

Second, when determining the likelihood of flight and assessing the risk to the community, we must consider the factors enumerated in 18 U.S.C. § 3142(g), *see Government of Virgin Islands v. Clark,* 763 F.Supp. 1321, 1323 (D.V.I.1991), *aff'd,* 989 F.2d 487 (3d Cir.), *cert. denied,* 509 U.S. 910, 113 S.Ct. 3012, 125 L.Ed.2d 702 (1993), which are:

1. The nature and circumstances of the offense charged;

2. the weight of the evidence against the person;

3. the history and characteristics of the person, including the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings;

4. whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

5. the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Finally, our Court of Appeals has held that once the defendant has been convicted, it is his burden of proving by clear and convincing evidence that he is not likely to flee or pose a danger to the community if he is released on bail pending sentencing. *See United States v. Strong,* 775 F.2d 504, 508 (3d Cir.1985); *see also United States v. Mustakeem,* 759 F.Supp. 1172, 1177–78 n. 7 (W.D.Pa.1991) ("Clear and convincing evidence means something more than a preponderance of the evidence and something less than beyond a reasonable doubt." (internal quotations omitted)).

As noted above, we held a hearing on defendant's motion for bail *pending his trial* on September 4, 1996. At that time, we concluded that under 18 U.S.C. § 3142 there was no condition or combination of conditions of release that would assure the appearance of Michael Marks at his trial. We will not revisit the findings we made at that hearing, since we have been given no reason to reconsider them. We shall only examine the salient differences between the defendant's prior motion for bail (which we denied) and the current one, specifically, (1) the fact that Michael Marks has now pled guilty to the ten counts charged in the indictment stemming from the fraudulent criminal conduct described above, (2) the stated existence of religious obligations stemming from Janet Marks's death, and (3) the increase in resources the family is willing to post as bail for Michael Marks.

### 1. *Guilty Plea*

We find that the crimes to which Michael Marks has pled guilty—wire fraud, interstate transportation of securities obtained by fraud, conspiracy to defraud the United States, and attempt to launder monetary instruments—evidence a criminal penchant for fraud, which makes the Court dubious of the defendant's assertions that we can trust him to appear for his sentencing. *See* § 3142(g)(1) (court is to take into account "the nature and circumstances of the offense").

The defendant's lack of forthrightness was evident during his guilty plea colloquy, where, for example, (a) he could not readily answer the question "How old are you?", *see*

November 18, 1996 Transcript at 4,[5] and (b) his answer—or, rather, his lawyer-coached answer—to the Court's question regarding his employment in recent years, *see id.* at 5.[6]

In addition, our dubiousness about Michael Marks's truthfulness is further bolstered by the assertion in the pending motion that he was not informed of his mother's death until today. According to the affidavit of Michael Marks's attorney, Michael Marks had not been told of his mother's untimely death "[b]ecause defendant's family is concerned that David [a/k/a Michael Marks] will be overcome with grief and possibly harm himself or commit other irrational acts...." Eoannou Aff. at ¶ 5. The family has therefore "concealed the death of his mother from [Michael Marks] and fabricated an elaborate story to account for her lack of contact" for over two and a half months. *Id.* In preparation for the hearing today, Mr. Eoannou has represented to the Court that Michael Marks was told today of his mother's death for the first time.

We harbor doubt about this representation to the Court. On October 22, 1996, defendant Maria Marks's lawyer, Joseph C. Santaguida, Esquire, filed a motion seeking permission for Maria Marks to travel to FCI Fairton in New Jersey "in order to provide comfort and to mourn with [Michael Marks] the loss of his mother." Maria Marks Mot. at ¶ 6. On October 24, 1996, we entered an Order allowing Maria Marks to travel to FCI Fairton for these humanitarian reasons. *See* Order of October 24, 1996. In a letter we received in Chambers today from Mr. Santaguida, he states, in support of his pending motion for permission to have Maria Marks travel to Washington, D.C. and Virginia, "Your Honor was gracious enough to permit my client to travel to Fairton so that she could inform her husband of his mother's passing." Santaguida ltr. at ¶ 1. He continues, "Mrs. Marks is certainly grateful Your

Honor permitted her to tell her husband of his mother's passing." *Id.* at ¶ 3.

Furthermore, having pled guilty to the ten counts charged in the indictment, Michael Marks faces a Guideline sentencing range of thirty-three to forty-one months.[7] Given the penalties to which he is subject at his sentencing, we find that the risk that Michael Marks will flee while released on bail is even greater now that he has pled guilty and awaiting sentencing than when we originally denied him bail prior to his guilty plea.

### 2. *Religious Obligations of the Black Feast*

■ The gravamen of Michael Marks's motion is that this Court should release him on bail pending his sentencing because of the religious practices he has to perform in preparation for the black feast in honor of his deceased mother.

Though defense counsel has not raised the Religious Freedom Restoration Act (the "RFRA" or "Act"), 42 U.S.C. § 2000bb, in his motion papers, we feel obliged to address Michael Marks's motion in light of the RFRA, since his argument touches upon the concerns over the free exercise of religion that underlie the Act. The RFRA provides that governmental action should not substantially burden the free exercise of religion unless it advances a compelling interest. The Act specifically states, in relevant part, that:

(a) In general

· Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

---

5. At the plea hearing, Marks, after conferring with his attorney, finally said he was 22 years old. By contrast, he told his pretrial services officer that his birthdate was December 22, 1970. At the hearing today, defendant produced a birth certificate revealing a birthday of November 27, 1974.

6. Marks could only answer the routine question about "what have you done for a living?" after his lawyer gave him the response.

7. Assuming, for this purpose, an offense level of 19 (*see* U.S.S.G. §§ 2S1.1(b)(2) and 3E1.1) and Criminal History II.

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1.

 The RFRA applies to claims of a prisoner, *see Werner v. McCotter,* 49 F.3d 1476, 1479 (10th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995); *Bryant v. Gomez,* 46 F.3d 948 (9th Cir.1995), who as a religious adherent has the burden of proving the existence of a substantial interference with the right of free exercise. *See Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995). After meeting this threshold showing, the burden shifts to the Government to demonstrate that the challenged regulation furthers a compelling state interest in the least restrictive manner. *See* § 2000bb–1(b). In enacting the RFRA, Congress did not intend the courts to discontinue the traditional deference they have accorded prison administrators:

> The committee does not intend the act to impose a standard that would exacerbate the difficult and complex challenges of operating the Nation's prisons and jails in a safe and secure manner. Accordingly, the committee expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

> At the same time, however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements.

*Alameen v. Coughlin,* 892 F.Supp. 440, 447 (E.D.N.Y.1995) (quoting S.Rep. No. 111, 103rd Cong., 1st Sess., *reprinted in* 1993 U.S.C.C.A.N. 1892, 1899–1900); *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir.1995) ("Constraints upon religious conduct will not fall within the ambit of the Act unless a

'substantial burden' is placed upon a prisoner's capacity to exercise or express his or her sincerely held beliefs or faith."). "Thus, reasonable time, place, or manner restrictions upon communal religious gatherings would often not necessitate the identification of a compelling state interest[.]" *Werner,* 49 F.3d at 1480.

Though we do not question the sincerity of Michael Marks's religious convictions, we find unpersuasive (i) his arguments that the preparations for his mother's black feast act as a "cultural surety" and conclusively prove that he will not flee while out on bail pending his sentencing or (ii) his implicit argument that his religious obligations require that the Court to release him.

First, we are far from convinced that his stated religious obligations decrease in any way the likelihood that he would flee the Court's jurisdiction were we to release him on bail pending his sentencing. The participation of other family members, who pled guilty to the criminal conduct charged in the indictment and who presumably would be attending the black feast, bolsters our conclusion. *See Holtz,* 1995 WL 106895 at * 3; *United States v. Bertoli,* 854 F.Supp. 975, 1159 (D.N.J.) (finding a defendant's family ties "dubious, as evidenced by his willingness to involve family members in his stock manipulation scheme"), *aff'd in part and vacated in part on other grounds,* 40 F.3d 1384 (3d Cir.1994). Furthermore, even Michael Marks's family recognizes that the news of his mother's death may lead the defendant to commit "irrational acts." Eoannou Aff. ¶ 5 ("[D]efendant's family is concerned that David [Michael] will be overcome with grief and possibly harm himself or commit other irrational acts" upon learning of his mother's death). In our view, such an irrational act may very well include fleeing the Court's jurisdiction.[8]

 Second, Michael Marks's assertion that he should be released so that he can prepare the black feast for his deceased mother simply proves too much. Were we to adopt Michael Marks's argument, he would be entitled to release at six months and one

---

8. Indeed, Marks's response to the asserted news of his mother's death was so severe that the

United States Marshal had to restrain him during the bail hearing today.

year after his mother's death in order for him again to prepare for the black feast. *See* Anderson Aff. 2 (the black feast must be given on the six week, six month and one year anniversary of the family member's death). The intent of the Religious Freedom Restoration Act was, *inter alia*, to assure that prison officials make accommodations to the sincere religious practices of prisoners *in prison*. Accommodation has its limits, however. One such limit surely must be that prisoners are not to be released from incarceration because their religious practices are more conveniently practiced outside of jail.

Finally, it is clear that the Government has a compelling interest in insuring that Michael Marks appear for this sentencing on the ten criminal charges to which he has pled guilty. *See* 42 U.S.C. § 2000bb–1.

3. *Increased Family Resources*

As detailed above, the extended Marks family is prepared to post as bail for Michael Marks two houses and one hundred thousand dollars in cash with the appropriate forfeiture agreements. This is, clearly, an impressive sum, and the family's profound concern for Michael Marks has not escaped our attention either today or at the September bail hearing.

We remain unconvinced, however, that Michael Marks will reciprocate that concern. Nothing we have heard at today's hearing makes us doubt our findings at the September 4 bail hearing regarding Michael Marks's irregular lifestyle—indeed, a lifestyle that would make him invisible should he flee. These immutable facts from Marks's past, coupled with his continual evasiveness on rudimentary personal matters, outweigh his family's laudable support for this wayward son.

In short, Marks has not carried his heavy statutory burden.

An appropriate Order follows.

## ORDER

AND NOW, this 26th day of November, 1996, after a hearing today on the defendant's motion for bail pending his sentencing, and for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion is DENIED.